BONNER *v.* BONNER

4-6843                                                166 S. W. 2d 254

Opinion delivered December 7, 1942.

*Coy M. Nixon* and *Rowell, Rowell & Dickey*, for appellant.

*E. W. Brockman*, for appellee.

HUMPHREYS, J.   On July 30, 1941, appellee brought suit for divorce in the chancery court of Jefferson county against appellant on the ground that he had threatened her with personal violence and imposed upon her many indignities which rendered her condition in life intolerable and prayed for temporary and permanent alimony, an interest in his personal property and real estate, reasonable attorneys' fee and court costs. It was alleged in her complaint that appellant had a large sum of money on deposit in the National Bank of Commerce and the Simmons National Bank of Pine Bluff, Arkansas, and prayed that same be impounded and that said banks be enjoined from honoring checks drawn against the deposits until the property rights between appellant and appellee be determined by the court.

On the date the complaint was filed, an impounding order was issued directing the banks to hold the deposits intact until further order of the court.

On the 2nd day of August, 1941, the trial court entered an order releasing $800 of the amount on deposit in the Simmons National Bank belonging to appellant in order that he might continue to operate his theatre in Pine Bluff. On the same date this order was made the court allowed appellee temporary alimony in the sum of $50 per month until final hearing of the case and allowed her attorney an initial fee of $100.

On September 8, 1941, appellant filed an answer denying the material allegations of the complaint, and a cross-complaint for a divorce alleging that appellee constantly quarreled at him, abused him and habitually offered indignities to him which rendered his condition in life intolerable. He also alleged that two days before their marriage they entered into an antenuptial written contract concerning the property of each as follows:

"Antenuptial Agreement and Property Settlement
"Know All Men By These Presents:

"That this agreement made and entered into this day and date by and between V. E. Bonner and Myrtle Gray, both of Pine Bluff, Arkansas, witnesseth:

"That Whereas, a marriage is intended to be solemized between the parties hereto, and in view of the fact that after their marriage in the absence of any agreement to the contrary, their legal relations and powers as regards property may, by reason of some change in their domicile, or otherwise, be other than those of their present domicile, or other than those which they desire to have apply to their relations, powers and capacities; and in view of the fact each of the contracting parties owns certain real estate at this time, and in view of the further fact it is agreed that the said V. E. Bonner has approximately five thousand dollars ($5,000).

"No, (now), therefore, each of the parties hereto hereby agrees, covenants and declares it to be his and her desire that during their marriage, each of them shall be and continue completely independent of the other with reference to the enjoyment and disposal of any property, real or personal, which either of them might own at

the time of the marriage aforesaid; that is to say, the said V. E. Bonner is to retain control over and be the absolute owner of any or all property belonging to him at the time of the marriage herein contemplated, and the said Myrtle Gray is to retain control over and be the absolute owner of any or all property belonging to her at the time of said marriage, and in the same manner as if the said proposed marriage had never been celebrated.

"And the parties hereto expressly agree and covenant to and with each other, that upon the death of either, the survivor shall not have and will not assert any claim, interest, estate or title, under the laws of the state, because of such survivorship, in or to the property, real, personal or mixed, owned by the other contracting party at the time of the solemnization of the marriage herein contemplated; and such survivor hereby relinquishes to their heirs, administrators, executors and assigns of such deceased party, any and all of his or her claim, distributive share, interest, estate or title that he or she would otherwise have as the surviving husband or wife in the property of the other, it being understood and agreed between the parties that this stipulation is to apply only to the property owned by either of them at the time of the marriage herein contemplated; and each agrees, upon demand, to make, execute and deliver to the heirs, administrators, executors and assigns of such deceased party any and all acquittances, assignments, deeds, instruments and receipts that may be necessary to carry out and make effective his or her agreement herein contained.

"It is further understood and mutually agreed by and between the parties hereto that after the proposed marriage is solemnized, as herein contemplated, if they or either of them is successful in the accumulation of any property, real, personal or mixed, then in that event, such after-acquired property is and shall be the joint property of the parties hereto, and each of them shall own the same, share and share alike, and shall be entitled to the enjoyment and use of the same.

"To the full and proper performance of all the foregoing agreements, covenants and stipulations, the parties here respectively bind themselves, their heirs, executors, administrators and assigns.

"In witness whereof, the parties hereto have hereunto set their hands and seals this 5th day of August, 1940.

"V. E. Bonner,
"Mrs. Myrtle Gray."

This contract was acknowledged by each before Julian Crawford, a Notary Public.

Appellant prayed for an absolute divorce.

On October 15, 1941, appellee filed an answer to the cross-complaint denying the material allegations therein and pleaded that the antenuptial agreement was contrary to public policy and void and that a postnuptial deed executed by appellant to her when read in connection with the antenuptial agreement amounted to a fraud practiced upon her and prayed for a cancellation of the antenuptial agreement and the postnuptial deed and also prayed that she be granted an interest in appellant's real and personal property according to the statutes of the State of Arkansas.

Thereafter, appellant filed an amendment to his cross complaint alleging that appellee frequently indulged in clandestine meetings with one Gould Ratliff, and with another man or men whose names are unknown to appellant.

Appellee filed an answer to the amendment denying that she had clandestinely met Ratliff or other men.

The cause was submitted to the trial court upon the pleadings and testimony produced by the respective parties which resulted in findings orally announced after the testimony had been closed and a decree was rendered November 3, 1941, denying each a divorce on the ground that the evidence showed that both were at fault and to blame and denied the relief prayed for by appellee, asking for a divorce from appellant, and also denied the

relief prayed for by appellant in his cross-complaint and dismissed the complaint and cross-complaint for want of equity; also, canceled the antenuptial agreement on the ground that it was contrary to public policy because it was entered into by the parties in contemplation of a divorce and was not made solely in contemplation of death and, also, that the postnuptial deed contained restrictions that amounted to a fraud practiced upon appellee by appellant; also allowed $50 per month as permanent alimony and an additional attorney's fee of $300 and dissolved the temporary injunction issued against the National Bank of Commerce and the Simmons National Bank.

Both parties excepted to the findings and decree of the court and each prayed and was granted an appeal to the Supreme Court.

The record reflects that appellant at the time of his marriage with appellee was 63 years old, had lost his first wife through death, by whom he had several children, and had lived with his second wife for 28 years, from whom he obtained a divorce.

At the time of the marriage appellee was 35 years of age, had living children and had been twice divorced.

Both were intelligent and both had had much matrimonial experience and should have known how to treat each other and how to conduct themselves in order to live a tranquil and harmonious married life. Neither of them seems to have learned much by past matrimonial experiences. Each offered the other indignities during their short married life of about a year, which they should not have done. For example, on one occasion appellee's son came in with a friend about 10 o'clock at night and awakened appellant, and in retaliation appellant got up, turned the radio on and ran it most of the night to keep them awake. Appellant checked the amount of gasoline appellee used in going from place to place in order to ascertain whether she had told him the truth as to where she had been. He was penurious in his allowances to her to purchase clothing, etc. On the other hand, at times she abused and even cursed him, but she claimed

that on those occasions he had greatly provoked her. He demanded that she inform him at all times where she had been or where she was going, and she admits that when she was being pressed along these lines she had told him that she had been across the way to a house that was not entirely reputable, but she said she did this in order to tease him, and he really knew she had not been to the place she stated she had gone. The evidence reflects that they had many quarrels during their short married life, and there is evidence tending to show that he not only threatened her but did strike or push her down a stairway. She went to a physician for treatment, but did not inform the physician what had caused the bruises on her body and the injury to her elbow. We do not attach much importance to his charge that she had indudged in clandestine meetings with Ratliff and another man for the reason that both the men denied that she had met them on any occasion and both claimed they only had a casual acquaintanceship with her. Appellant did not think enough of this to make the charge in his original cross-complaint against her to that effect. He did not make the charge until he filed amendment to his cross-complaint to her suit.

Many witnesess testified in the case concerning their married life, and the testimony is voluminous and very conflicting. After a careful reading and analysis of the evidence, we have concluded that the finding of the chancellor to the effect that both were to blame is not contrary to the weight of the evidence. Where married people are equally to blame for separation, neither is entitled to a divorce from the other.

We think, however, that the finding of the chancellor that the antenuptial agreement was made in contemplation of a divorce and not solely in contemplation of death is contrary to a preponderance of the evidence. By reference to the contract itself it will be seen that they "expressly agree and covenant to and with each other, that upon the death of either, the survivor shall not have and will not assert any claim, interest, estate or title, under the laws of the state, because of such survivorship,

in or to the property, real, personal or mixed, owned by the other contracting party at the time of the solemnization of the marriage herein contemplated . . ." The contract further provides that "survivor hereby relinquishes to the heirs, administrators, executors and assigns of such deceased party, and any and all of his or her claim, distributive share, interest, estate or title that he or she would otherwise have as the surviving husband or wife in the property of the other." It will also be observed that the contract winds up with this statement: "To the full and proper performance of all the foregoing agreements, covenants and stipulations, the parties hereto respectively bind themselves, their heirs, executors, administrators and assigns."

It is true that appellant testified that he wanted to protect himself in his property rights in case a divorce should grow out of the marriage contract, but he testified at another time that he told appellee that he wanted her to sign the contract in order to show his children by his first wife that appellee was not marrying him to get his property, but was marrying him for love.

It is admitted by appellee that the contract was read to her and that she read it over carefully two days before she married appellant and that she understood it. There is nothing in the contract itself that indicates it was drawn up and executed in contemplation that a divorce would result after the marriage. We think it was clearly made in good faith and that the marriage was the sole consideration of the contract, and that it should continue in force until death of either party.

In the case of *Comstock* v. *Comstock*, 146 Ark. 266, 225 S. W. 621, this court, among other things, said: "Marriage was a sufficient consideration for the antenuptial contract. Where such contracts are freely entered into and are not unjust or inequitable, and there is no fraud, they should be liberally construed to effectuate the intention of the parties and should be looked upon with favor and enforced accordingly. . . . Without going into detail, we are convinced, from the face of the contract and the evidence adduced, that, when the per-

sonal status of the parties, their ages, their respective families, and their separate properties are considered, the antenuptial agreement was a just and reasonable one.''

In *Schouler on Marriage, Divorce and Separation,* Vol. 1, § 498, it is said by the author that: ''There is no rule of law nor principle of public policy which prevents husband and wife from thus fixing, by an agreement before marriage, the rights which they shall have in each other's property, and relinquishing the interests which they would otherwise acquire therein by virtue of the marriage. Thus, they may relinquish their distributive shares in each other's estates, or the wife may bar her dower or the husband his curtesy. The husband may agree that his wife may retain all her own property to her sole and separate use, and he may settle his own property on her. And the devolution of the property of either or both may be regulated. These objects the law does not regard as contrary to public policy.''

The contract in the instant case was entered into after an inspection of the property owned by each, and we think the record reflects without doubt that it was entered into by the parties in good faith and without fraud being practiced by either upon the other. The contract was not void as being contrary to public policy and should have been upheld by the trial court.

The contract contains the following provision: ''It is further understood and mutually agreed by and between the parties hereto that after the proposed marriage is solemnized, as herein contemplated, if they or either of them is successful in the accumulation of any property, real, personal or mixed, then in that event, such after-acquired property is and shall be the joint property of the parties hereto, and each of them shall own the same, share and share alike, and shall be entitled to the enjoyment and use of the same.''

The undisputed evidence reflects that after their marriage appellant accumulated during the time they were married $824.12, and under the terms of the contract

appellee would be entitled to $412.06. She should have judgment for that amount.

Appellant contends that in view of the terms of the contract the court should not have allowed appellee permanent alimony. We cannot agree with appellant in this respect notwithstanding the terms of the antenuptial agreement. It was and is the duty of appellant to support his wife according to the station in which they live. This duty would not rest upon him if he were entitled to a divorce, but it does rest upon him as long as they are married unless she had abandoned him without just cause. He is as much to blame as she for the separation, and it is his bounden duty to support her as long as the bonds of matrimony exist between them. The amount of permanent alimony allowed appellee is reasonable. Appellant makes no point that the attorney's fee allowed was excessive.

Relative to the postnuptial deed which appellant executed to appellee, we see no justification in the record for canceling same. It is true that it contains a restriction to the effect that appellant shall retain possession of the property and collect the rents therefrom during his lifetime, but that restriction should not void the deed. Appellant had a perfect right to give her the property and place restrictions in the deed if he desired to do so. It was his privilege to convey to her outright or upon conditions.

The decree of the chancery court is affirmed insofar as it denied a divorce to either party and as to the amount of permanent alimony and attorney's fee.

The decree is reversed insofar as it canceled the antenuptial agreement and the postnuptial deed and the cause is remanded with directions to declare both the antenuptial contract and the postnuptial deed valid and binding instruments and to enter judgment for appellee for one-half of the amount appellant has earned since the marriage.

GREENHAW, J. (dissenting). I think the preponderance of the evidence shows that appellee's conduct was such that appellant was entitled to a divorce on his cross-complaint, and I, therefore, dissent.