Jimmie Elwyn LYTLE *v.* Gula LYTLE

78-289                                              583 S.W. 2d 1

Opinion delivered June 25, 1979
(In Banc)

*Harkey, Walmsley & Belew* and *Spitzberg, Mitchell & Hays,* for appellant.

*Pickens, Boyce, McLarty & Watson,* by: *Tim F. Watson* and *Fred M. Pickens, Jr.,* for appellee.

JOHN A. FOGLEMAN, Justice. The parties to this appeal were married in 1952. They separated February 13, 1977. Appellee Gula Lytle, the wife, filed a petition for separate maintenance against appellant, Dr. Jimmie Lytle, on March 1, 1977. Dr. Lytle filed a counterclaim for absolute divorce on the ground of indignities to the person. After several preliminary hearings and orders, the case was set for trial on February 28, 1978. On February 13, 1978, Mrs. Lytle filed an amendment to her petition, alleging that Dr. Lytle had deserted her without cause and remained away since their separation. She sought a divorce on the ground of desertion. The trial court held that Mrs. Lytle was entitled to a divorce on the ground of desertion, that Dr. Lytle did not have grounds for divorce and therefore had left Mrs. Lytle without reasonable cause. The chancery court awarded Mrs. Lytle possession of and title to certain real property, including the home in which the parties had resided in Batesville, along with certain personal property, cash and alimony of $1,500 per month. Appellant raises the following points for reversal:

I

THE TRIAL COURT ERRED IN FINDING THAT THE APPELLEE WAS ENTITLED TO A DIVORCE FROM THE APPELLANT ON THE GROUND OF DESERTION.

II

THE COURT ERRED IN DENYING THE APPELLANT A DIVORCE ON GROUNDS OF GENERAL INDIGNITIES.

## III

### THE CHANCELLOR ERRED IN GRANTING APPELLEE TITLE TO THE PARTIES' RESIDENCE.

## IV

### THE COURT ERRED IN AWARDING APPELLEE'S SOLICITOR A FEE OF $7,500.00 AND CHARGED TO THE APPELLANT.

## I

It is appellant's contention that the statutory requirement of absence from his spouse for a period of one year was not satisfied. He contends that there was not wilful desertion in the sense of Ark. Stat. Ann. § 34-1202, Second (Supp. 1977) because he was absent with the consent (implied if not express) of Gula Lytle. He based his contention that appellee consented to his absence upon her petition for separate maintenance, coupled with the fact that on April 19, 1977, the chancery court entered an order restraining either party from going around the other.

Of course, the statute provides for divorce where one party wilfully deserts and absents himself from the other for a space of one year without reasonable cause. There is evidence that Mrs. Lytle begged Dr. Lytle not to leave on the day before he actually left but there is no evidence that he ever made any attempt to return or to offer to return. Appellant cites cases from other jurisdictions holding that the period during which a prior matrimonial action is pending may not be included in the period of desertion necessary to support a divorce on the ground of desertion and that a matrimonial action by a deserted party which precedes a suit for divorce manifests that party's consent to the spouses' living apart. Some of the cases cited are obviously inapplicable because they relate to situations quite different from this one. For instance, there may be a valid reason to hold that the pendency of a wife's petition for separate maintenance would operate to toll the desertion statute so the husband could not base a ground of desertion on the wife's absence during the period

that action was pending. See 24 Am.Jur. 2d 272, Divorce & Separation, § 110. Separate maintenance to a wife is granted upon the premise that the wife is without adequate means of support and has been abandoned, without fault on her part. *Rosenbaum* v. *Rosenbaum*, 206 Ark. 865, 177 S.W. 2d 926; *Kientz* v. *Kientz*, 104 Ark. 381, 149 S.W. 86. See also, *Bonner* v. *Bonner*, 204 Ark. 1006, 166 S.W. 2d 254.

Cases holding that a suit for limited divorce interrupts the continuity of the period of desertion are not persuasive. There is a significant difference between an action for separate maintenance and an action for a limited divorce or divorce from bed and board. See *Womack* v. *Womack*, 247 Ark. 1130, 449 S.W. 2d 399. A limited divorce is called divorce from bed and board in our statute. See Ark.Stat. Ann. § 34-1202. It is also known as divorce a mensa et thoro. See *Rose* v. *Rose*, 9 Ark. 507. In order to obtain such a divorce, it is necessary for the moving spouse to establish grounds. Ark.Stat. Ann. § 34-1202; *Myers* v. *Williams*, 225 Ark. 290, 281 S.W. 2d 944; *Clyburn* v. *Clyburn*, 175 Ark. 330, 299 S.W. 38; *Gray* v. *Gray*, 98 S.W. 975 (unreported in Arkansas Reports). The grounds on which such a divorce may be granted are the same as those specified for an absolute divorce, which is also called divorce from the bonds of matrimony or divorce a vinculo matrimonii. See Ark. Stat. Ann. § 34-1202. In a wife's action for separate maintenance, it is unnecessary for her to establish any grounds except the separation and the absence of fault on her part. *Hill* v. *Rowles*, 223 Ark. 115, 264 S.W. 2d 638; *Rosenbaum* v. *Rosenbaum*, supra. So an action for separate maintenance may be based upon a husband's wrongfully leaving his wife and is in nowise inconsistent with his continued absence being without reasonable cause. Nor does its pendency give him cause for continuing to absent himself. It is simply a means for a dependent wife to obtain support from her absent husband during his absence, when the absence is not her fault.

We do not agree with appellee, however, that the question is one which was settled in *McKay* v. *McKay*, 172 Ark. 918, 290 S.W. 951. In that case, the wife's two suits for divorce on the ground of cruel and inhuman treatment by her husband had been dismissed. In her third suit, based on alleged deser-

tion by the husband, the husband was granted a divorce on his counterclaim on the ground of desertion. The decree was reversed because the wife had offered to return to the husband within a year after she left him. We cannot say that we refused to hold that the prior divorce suit affected the running of the statutory period. We simply failed to so hold and it was unnecessary to do so, because the wife attempted, in good faith, to attempt a reconciliation. We did hold that a decree denying the wife a divorce for cruelty in her first suit, entered more than a year prior to the filing of her third suit, was not a bar to the suit on the ground of desertion.

We do not mean to say that there is no support for appellant's view in cases from other jurisdictions. But it is pointed out by textwriters that it has even been held that a decree of separate maintenance establishes that the plaintiff is living apart without fault, and may, if the other spouse persists in staying away after the decree is entered, establish the commencement of a desertion by the losing spouse. 27A CJS 102, Divorce § 36 (1). It is also said that, even though a wife could have obtained an absolute divorce on the ground of desertion at the time she obtained a decree for separate maintenance, she could later obtain an absolute divorce on the ground of desertion which began before the entry of the decree for separate maintenance and continued until she sued for an absolute divorce. 24 Am.Jur. 2d 271, Divorce & Separation, § 110.

Appellant may well be correct in his assertion that in a majority of the cases dealing with the question, it has been held that the period of pendency of a prior matrimonial action will be excluded in computing the period of desertion as a matter of law, and that some of them are fairly recent. We believe, however, that the rule followed in those jurisdictions is unsound, particularly where the prior action is simply one for separate maintenance, which may be necessary for the subsistence of the innocent spouse during the desertion by the absent one. We agree with the following statement found at 1 Nelson, Divorce & Annulment 142, § 4.40:

> Although the general rule which requires exclusion of the period of pendency of another suit is an old one,

and well established in at least several jurisdictions, we are frank to confess that we prefer the exceptions to the rule. The foundations of the rule are shallow and lacking in logic, except as one bringing a suit for divorce, separate maintenance or annulment may be presumed to acquiesce in non-cohabitation while the suit is pending. There is no reason to suppose that the opposite party, the defendant, is kept from offering or attempting to resume cohabitation because he stands sued. Pendency of such a suit may well keep the plaintiff therein from accepting an offer of reconciliation, if made, which fact should suffice to justify the refusal or ignoring of such an offer during that time and prevent becoming at fault for so refusing; but it should not, in effect, excuse the making of an offer by the defendant by suspending the desertion period while the action is pending.

It is also held in many jurisdictions that the rule that the time consumed by a divorce action between the parties cannot be counted as a part of a period of desertion upon which a subsequent suit for divorce is based will not aid the defendant in the later suit, where his absence began before the commencement of the former suit and was not referable to it, but was due to his own conduct, since the rule should not be construed to give an innocent character to the continuation of a wrongful desertion. See Annot. 80 ALR 2d 855, 870, 876.

We hold that the period of the pendency of an action for separate maintenance does not toll the running of the period required to constitute desertion by the husband as a ground for divorce, where the husband's absence began before the institution of the suit for separate maintenance, and the wife was not to blame for the separation.

We do not consider the restraining order to have any bearing in this case. It does not appear to have been entered on Mrs. Lytle's motion. There was no prayer for such relief in her petition for separate maintenance. She asked for injunctive relief only to prevent Dr. Lytle from removing any property other than that he had already removed from the premises in which the parties had previously lived. The restraining order indicates that it may have been entered

by agreement of the parties, although it may have been entered on the court's own motion. We do not consider the order to have constituted a real barrier to Dr. Lytle's return to the marital residence, if he had desired to do so. We consider that the real test is whether Dr. Lytle's remaining away from his wife was attributable to the action taken or to an attitude that was so hostile and determined that he would have stayed away in any event.

It seems clear to us from the record in this case that Dr. Lytle left with the intention of absenting himself from his wife and that he has never wavered in that intention. He filed a counterclaim for divorce before the restraining order was entered. In his pleading, he alleged that his condition in life was intolerable, although he said that his wife's conduct had rendered it so. He has forcefully, if not bitterly, contested this action at every step and prosecuted his own claim for divorce. He admitted that the subject of marriage counselling may have been brought up by Mrs. Lytle after he had decided to leave, but said that he had then made up his mind to leave. There simply is no indication whatever that Dr. Lytle had any inclination to return or that he would have entertained the idea of doing so, even if there had never been a separate maintenance action or a restraining order.

Appellant also argues that since his own counterclaim was brought in good faith, its pendency suspended the running of the desertion period. We do not agree, even though we do not question the fact that Dr. Lytle filed his pleading in good faith. His absence commenced before any suit was filed, and, as previously pointed out, the rule that the time consumed by a divorce action between the parties cannot be counted as a part of a period of desertion upon which a ground for divorce is based should not be used to give an innocent character to the continuation of a wrongful desertion. We agree with the chancellor that the real issue on the question of desertion was whether Dr. Lytle, to paraphrase the statute, deserted and absented himself from Mrs. Lytle "for a space of one (1) year without reasonable cause." Ark. Stat. Ann. § 34-1202. As we shall presently point out, the chancery court resolved this question against Dr. Lytle, and we are un-

able to say that this fact-finding was against the preponderance of the evidence.

Furthermore, we are unable to see that the evidence shows that Mrs. Lytle was not willing during the entire statutory period to receive Dr. Lytle back to the matrimonial relationship. Mrs. Lytle testified that she amended her pleading after a year had passed, and that there was no hope for reconciliation. She testified that she was in love with her husband when he left and that she had always been in love with him. Although she testified that she did not think there was ever any real chance of reconciliation, she said that when he left, she was thinking in terms of reconciliation. She did not try to communicate with Dr. Lytle before she consulted a lawyer a week after the doctor left, because her husband had made no effort to contact her and she thought it best to consult a lawyer and have him communicate with Dr. Lytle to ascertain his intentions. When we recall her undisputed testimony that, on the day before the separation, she begged Dr. Lytle not to leave, but to go to a marriage counselor or a preacher, and after receiving the response that she was crazy, asked him to take her to a psychiatrist, we cannot read any consent to appellant's remaining away into her testimony, as appellant would have us do.

## II

Appellant contends that, in terms of destructive behavior, Gula Lytle was more to blame for the demise of the marrige than he. The "indignities" on which he relies were her concern for money, an indifference to his family, a clear pattern of repeated accusations of his infidelity, a consistent campaign to alienate the three sons of the parties from him and her insensitivity to his ideas and ideals. He specified none of these things in his counterclaim, where he merely stated the conclusion that Mrs. Lytle had "treated and accorded [him] such contempt, neglect and unmerited reproach, habitually and systematically pursued as to render the condition of [Dr. Lytle] in life intolerable."

Although the scope of the "indignities" ground has undergone considerable expansion throughout the years, it is

still necessary that the conduct relied upon manifest settled hate, alienation and estrangement and be constantly and systematically pursued with the purpose and effect of causing an enduring alienation and estrangement and rendering the condition of the spouse intolerable. *McNew* v. *McNew*, 262 Ark. 567, 559 S.W. 2d 155; *Welch* v. *Welch*, 254 Ark. 84, 491 S.W. 2d 598. In the cited cases, we pointed out that even this c nstruction of the statute is to be cautiously applied.

It is extremely difficult to fit appellant's characterization of Mrs. Lytle's faults into the required pattern. The chancellor found that, even though Mrs. Lytle's conduct was shown to have been objectionable in a number of respects, the evidence fell short of establishing grounds for divorce when judged by established standards for the ground alleged by Dr. Lytle. We are certainly unable to say that the chancellor's findings were clearly against the preponderance of the evidence.

Dr. Lytle's own testimony did not make a strong case for his abrupt termination of a 25-year marriage. He said that the problem had started a year previously over a situation at the clinic where he and two other doctors conducted a medical practice, and where Mrs. Lytle had commenced working, at his request, in January, 1976. After a management consultant had conducted a study, Dr. Lytle told Mrs. Lytle she could no longer work at the clinic office. Prior to that time, according to him, they had a happy marriage with "ups and downs." He said that it had been a mistake to let her work at the clinic in the first place. He was exasperated because she had called a patient about a bill, which she had considered "old," although he did not. He said that during the year preceding the separation, Mrs. Lytle frequently accused him of going with other women, but never tried to catch him. He said that he was upset that, when Mrs. Lytle came home after an absence on account of her mother's illness, she suspected that he was talking with a woman, when she found him talking on the telephone to a patient and followed him to the hospital the next day. Dr. Lytle said that on that occassion he was simply trying to get away from her. He was distressed when she offered to sell a quilt his mother had made to his mother's sister, who had sent a check, but said that appellee tore up the check when he asked her not to

sell it. He said that he was embarrassed when Mrs. Lytle remarked to friends that the church couldn't run without the Lytle children. Her concern for money was evidenced, according to appellant, by her efforts to collect the bill from the patient and the fact that she did not particularly like his policy of treating poor people who could not pay him. He was displeased because of Mrs. Lytle's failure to invite his parents to eat at the parties' home in Batesville and the resentment she displayed when two of their boys were helping to paint his mother's house without pay, when the other son was being paid $500 for the job. He also was displeased because Mrs. Lytle sent his mother a bill for work he was having done on his father's grave. Another "indignity" was her failure to go to Ft.Smith to attend the funeral of his favorite nephew or to express sympathy to any member of appellant's family.

On the other hand, Dr. Lytle admitted that he had known of only one incident when Mrs. Lytle was overzealous about her bill collecting, that his mother had wanted to pay the bill for the work done on his father's grave, that his wife did go to Spring Hill to the graveside service for his nephew, and that he had probably done wrong by not going to a marriage counselor or a preacher. Not only did Gula Lytle contradict much of appellant's testimony, but she related matters which would lead one to believe that Dr. Lytle was responsible for the deterioration of the marriage. Some of her testimony was corroborated by others, including the adult sons of the parties. No useful purpose would be served by pinpointing her version or her denials. The matter of credibiltiy is a field into which an appellate court cannot successfully penetrate upon a cold record. Weighing the evidence in this case depends upon the credibility factor to such an extent that it is impossible for us to say that the chancellor erred in that respect. As the chancellor observed, there was evidence by witnesses other than Dr. Lytle indicative of objectionable conduct on the part of Mrs. Lytle, but it would be difficult for us to say that it was habitually and systematically pursued or that it was indicative of settled hate, alienation and estrangement.

## III

It is the contention of appellant that the chancery court was without power to divest him of title to the residence prop-

erty which had been held as a tenancy by the entirety. Appellant relies upon *Yancey* v. *Yancey*, 234 Ark. 1046, 356 S.W. 2d 649. See also, *Ramsey* v. *Ramsey*, 259 Ark. 16, 531 S.W. 2d 28. The statute in effect when *Yancey* was decided authorized the court to dissolve an estate by the entirety. Act 340 of 1947. By Act 457 of 1975, the statute was amended so the dissolution by the court is unnecessary. The decree operates as an automatic dissolution of the estate by the entirety, unless the court specifically otherwise provides by order. Since the decree did not otherwise provide, a tenancy by the entirety was necessarily treated as a tenancy in common.

The title to this property, which Mrs. Lytle valued at $40,000, was not the only property in which the parties had been tenants by the entirety. There were 50 acres of land in Independence County she valued at $6,000 and 40 acres she valued at $1,000. There was also a lot in Horseshoe Bend Estates on which she put a value of $3,000. Mrs. Lytle also listed, in answer to interrogatories, her wife's dower interest in lots held by him in the Medical Arts Building and grounds in Batesville, which she valued at $100,000. It later was shown that this property was owned by North Arkansas Clinic, Inc., in which Dr. Lytle owned 20% of the capital stock. The corporation had assets of more than $1,000,000. There was evidence indicating that Dr. Lytle's stock had a value of $100,000 to $150,000. Another interest in real estate listed by her was a note secured by a deed of trust on lands in Cleburne County, upon which there was a balance due of $2,-241.05. The title to this property had been held by the parties as tenants by the entirety. Other jointly owned property listed by Mrs. Lytle included an Airstream trailer, a mobile home, and an indebtedness owed by Randy Johnson.

In making the property division awarding Mrs. Lytle the house in Batesville and the land on which it sits, the Horseshoe Bend lot, the 40-acre tract, the note, a municipal investment trust fund account with Merrill, Lynch, Pierce, Fenner & Smith, Inc., the Airstream trailer and an Oldsmobile, and awarding Dr. Lytle the 50-acre tract, the Randy Johnson note and his stock in the Medical Arts Building and lots, the chancellor made this explanation:

As to a division of property, I find that Mrs. Lytle is entitled to receive one-half of the property that she and Dr. Lytle owned jointly and one-third of the property that Dr. Lytle held in his own name. Because of the nature of the property involved it was necessary that I award Mrs. Lytle well in excess of one-half in value of the jointly owned property and to credit that amount over one-half in value of the joint property against her interest in one-third of the husband's property (this was necessary because a large portion of the husband's separate property was involved with his medical practice and would not be susceptible to a division in kind or a forced sale).

I find that by the award of property that is outlined below that Mrs. Lytle will receive property which has a value equivalent to one-half of the jointly owned property plus one-third of the property held by the husband in his name.

Appellant does not complain of the award of the other property which had been held by the entirety, either to Mrs. Lytle or to him. He does not propose an alternative distribution, but if Mrs. Lytle is given only a life estate, instead of outright title to the residence, it is obvious that an adjustment of the property distribution is in order. A part of the personalty owned by Dr. Lytle was 520 shares of stock in North Arkansas Clinic, Inc. which had an estimated value of $150,-000.

The chancellor was faced with a difficult problem relating to property division in that a substantial part of Dr. Lytle's assets was his interest in the North Arkansas Clinic, Inc., a corporation owned by Dr. Lytle, two other doctors, a pharmacist, the business manager of the Medical Arts Building and a man named Lloyd Leftwich. He also had an accounts receivable balance of $73, 272, of which about 90% was collectible.

The chancellor in *Yancey* v. *Yancey*, supra, had also undertaken to arrive at an equitable solution relative to property rights, and we found nothing erroneous purely from the

standpoint of equity, but held that when a tenancy by the entirety was converted into a tenancy in common in a divorce proceeding, the chancery court could only do one of two things: it may put one of the parties in possession of the premises, or it may order the property sold and the proceeds divided. The language of that decision permits no exception. It is a rule of property. We have no choice in the matter and the cause must be reversed on this ground. In *Yancey*, we remanded the case to the chancery court to make new findings relative to property rights, because its findings as to other property might have been influenced by its disposition of that property. Here, as illustrated above, the disposition of the property held by the entirety is the keystone of the property distribution, so the case will have to be remanded for further proceedings in that respect.

## IV

Appellant objects to the attorney's fee allowed in this case on two bases. First, he says there is absolutely nothing in the record to afford an objective standard on which the trial court could assess and determine the amount of the fee, and urges that we treat fees arrived at in such a "haphazard" fashion from a subjective viewpoint by the chancellor as erroneous. We decline to accept this invitation. We have repeatedly held that the award of attorney's fees in divorce cases is a matter lying within the sound judicial discretion of the chancellor, the exercise of which will not be disturbed on appeal in the absence of its abuse. *McGuire v. McGuire*, 231 Ark. 613, 331 S.W. 2d 257; *Bowers v. Bowers*, 257 Ark. 125, 514 S.W. 2d 387; *Yohe v. Yohe*, 238 Ark. 642, 383 S.W. 2d 665; *Equitable Life Assurance Society v. Rummell*, 257 Ark. 90, 514 S.W. 2d 224. Unless appellant has demonstrated that the amount of fees allowed was excessive, we will affirm. *Equitable Life Assurance Society v. Rummell*, supra. Unless appellant has demonstrated that the amount of fees allowed was excessive, we will affirm. *Equitable Life Assurance Society v. Rummell*, supra.

The real thrust of appellant's first argument is that the basis for allowance of fees in cases such as this should be the amount of time devoted by the attorney to the case, with

other factors to be considered only to enhance or decrease the amount determined, apparently by multiplying the hours spent by an hourly rate. We are not unaware of the reasons for, and importance of, the prevalent custom of keeping of accurate time records by lawyers. A slavish obsession with basing fees on this element alone can lead to results as inequitable as any other method of fee determination. In rejecting the hours spent on a case as the sole basis for fee determination, in *Weeks* v. *Southern Bell Telephone & Telegraph Co.*, 467 F. 2d 95 (5 Cir., 1972), one court has appropriately said:

> * * * In any event, the time factor, has a "dubious virtue . . . . . as a standard for legal services"; "when hours of time become a criterion, economy of time may cease to be a virtue." See Hornstein, Legal Therapeutics: The "Salvage Factor in Counsel Fee Awards", 69 Harv.L.Rev. 658 (1956).

Lawyers are not mechanics or craftsmen whose productivity can be approximated on the basis of time spent. Any lawyer can recall, without difficulty, instances in which, viewing the matter in retrospect, he has wasted as much time in a particular case as he actually utilized wisely in his client's best interest. In such a case, the client (or whoever must pay the fee) should not be expected to pay for the full time devoted at some commercially established rate. Such a practice would bemean the legal profession. The time devoted is, of course, a significant factor. See *Robinson* v. *Champion*, 251 Ark. 817, 475 S.W. 2d 677. But there are other factors just as important. See *Old Republic Insurance Co.* v. *Alexander*, 245 Ark. 1029, 436 S.W. 2d 829. We have had the occasion to mention them more than once. See *Robinson* v. *Champion*, supra; *Old Republic Insurance Co.* v. *Alexander*, supra; *Equitable Life Assurance Society* v. *Rummell*, supra.

The Code of Professional Responsibility, adopted by this court in the regulation of the practice of law, also treats the matter. See DR2-106(B); EC 2-18. To single out one of the many factors as predominant would be wrong. We think that the courts are still able to evaluate legal services equitably and to strike a balance between the interest of the lawyer and those of the client, or of one who is to bear the burden. It was

not necessary that the trial judge conduct a hearing on the amount of attorney's fees to be allowed, because he had presided over the proceeding, was familiar with the case and the services rendered by appellee's attorneys. *Pitcher* v. *Baltz,* 242 Ark. 625, 414 S.W. 2d 859. On appellate review, we give considerable weight to the opinion of the trial judge before whom the case was tried. *Robinson* v. *Champion,* supra; *Republic Insurance Co.* v. *Alexander,* supra.

Appellee's counsel has pointed out matters, most of which could not have escaped the attention of the chancellor, who had an intimate view of the entire proceeding. Among them are:

1. Six days of hearings before the chancery court.

2. Two days of depositions.

3. Extent and complexity of property holdings

4. Problems arising from disobedience of court orders by appellant.

5. 743 pages of trial court record.

6. Appellant's brief of 210 pages.

7. Multiplicity of issues.

8. Disparity in incomes of the parties.

In attempting to establish a basis for distribution of property, it was necessary that interrogatories be propounded to appellant. Extensive and detailed answers to appellant's interrogatories to appellee were also prepared and filed. On one occasion, appellant was cited and found guilty of contempt of court for violation of the court's restraining order.

Appellant's second argument is that Mrs. Lytle had ample resources to pay her own attorney's fees. The record reveals that appellee's work experience was limited to employment as a telephone operator and as a babysitter,

after the marriage, while Dr. Lytle was in medical school. She worked in his office for three months immediately after they moved to Batesville in 1959. She also worked there occasionally when some regular employee was absent or unavailable. She also worked part time at a Montgomery Ward store for a time. The living expenses of the parties were paid from a monthly deposit of $2,500 in a joint checking account by the administrator of the clinic at which the doctor practiced. At the time of the separation, Mrs. Lytle had, in her own name, a savings account of approximately $6,000, from savings of her salary from Montgomery Ward. She had no income, to Dr. Lytle's knowledge. Mrs. Lytle is physically handicapped by a back problem, has undergone four laminectomies, and had seen a doctor on account of this problem as late as July or August, 1977.

During the year 1977, Dr. Lytle drew $111,831.20 from his drawing account at the clinic. In 1976, he paid income tax on an adjusted gross income of $82,263. His actual collections from his practice in January, 1977, were $9,959.50. His total income for 1977, after deductions, was $102,642. He has accumulated $15,642.50 in Medicaid Deferred Compensation. At the time of the trial, he had $6,000 or $7,000 at his home.

We have no hesitation in saying that Mrs. Lytle was properly considered as a dependent wife for the purpose of allowance of attorney's fees. The $2,000 per month for maintenance during the pendency of the action was not substantially different from allowances given her during the marriage.

We find no abuse of discretion in the allowance of attorney's fees in this case. We feel, however, that, in view of the alimony paid during the pendency of the action and the amount allowed in the trial court, additional allowances for attorney's fees should not be made on this appeal.

The decree is affirmed except as to the distribution of the property and the cause is remanded for further proceedings in that respect.