Tommy LILES and Dave Wisdom HARROD *v.* Barbara LILES

85-252                                              711 S.W.2d 447

Supreme Court of Arkansas
Opinion delivered June 2, 1986

*Junius Bracy Cross, Jr.*, and *Deborah Davis Cross*, for appellant Tommy Liles.

*Wright, Lindsey & Jennings*, for appellant Dave Wilson Harrod.

*Thomas, House & Smith*, by: *Douglas House*, for appellee.

DAVID NEWBERN, Justice. This case involves an action by a former wife, the appellee, Barbara Liles, to set aside a property settlement into which she had entered with her former husband, the appellant, Tommy Liles, in contemplation of divorce. She sued to set aside the agreement and to recover her expenses related to the action, including her attorney's fee. The chancellor set aside the property settlement and entered a new property division order. He awarded Barbara Liles an additional amount of money, which he characterized as both damages and an attorney's fee, jointly and severally against Tommy Liles and attorney Dave Wisdom Harrod, the other appellant, whose fraudulent conduct the chancellor determined to have been responsible for the improperly induced agreement. Both of these remedies were appropriate, and we affirm.

The following is a summary of the facts as found by the chancellor: Barbara and Tommy Liles were married in 1970. She had two children from a previous marriage. In 1976 Barbara engaged Dave Wisdom Harrod to represent her in divorce proceedings against Tommy. A divorce was granted. Barbara and Tommy reconciled, and the divorce was annulled in 1977.

In 1978, Tommy was injured while working for an off-shore oil driller, Rowan Drilling Co. His personal injury claim was covered by the Jones Act, 42 U.S.C. § 688. He and Barbara consulted Harrod about Tommy's possible personal injury remedies, and they were told by Harrod of the expertise of a Texas attorney, Benton Musslewhite, in Jones Act litigation. Harrod

and Musslewhite associated to bring a claim against Rowan on behalf of Tommy. When the claim was filed in the U. S. District Court in Texas, Tommy's workers' compensation payments ceased, and Musslewhite loaned $500 to the Liles. Later, Barbara learned of the involvement of Newton Schwartz, another Texas lawyer, when Musslewhite wrote Harrod about splitting the prospective attorney fee with Schwartz.

Tommy's Jones Act claim against Rowan resulted in a judgment in Tommy's favor of 2.5 million dollars. Although it was not stated by the chancellor in his findings, it is undisputed that Aetna Insurance Co., Rowan's carrier which handled the litigation, threatened to appeal. On May 2, 1981, a structured settlement agreement was reached. The settlement required Aetna to pay Tommy a lump sum of $400,000; $2,000 per month for life with a thirty-year guarantee beginning June 1, 1981; $65,000 on June 1, 1986; and $35,000 every five years from June 1, 1991 through 2001. The monthly and incremental lump sum payments were to be made to Harrod as trustee of the Tommy R. Liles trust.

Returning to the facts found by the chancellor: Marital problems between Barbara and Tommy arose during the negotiations with Aetna. Tommy, Harrod, and Bryce Marler, a private investigator and former bail bondsman, were making plans to set up a company called Southern Investment Corporation. A purpose of the business was to be the financing of Jones Act litigation on behalf of injured employees of off-shore drilling companies. Tommy was to have an airplane so he could fly up and down the coastal area looking for potential claimants. Barbara's objection to this scheme led to further marital difficulties. Barbara decided to seek a legal separation, and she and Tommy went together to Harrod's office where Harrod prepared a separation agreement. Barbara and Tommy again reconciled, and she accompanied him to Houston, Texas, where they signed the settlement documents on or about May 2, 1981.

On May 8, 1981, Tommy was staying at a lake cabin, away from the marital home in Drasco, Arkansas, because he was upset over Barbara's objection to the Southern Investment Corporation plan. On May 10, 1981, Tommy appeared at the house and ran Barbara away, threatening her with a shovel. Barbara went to a

nearby store. Harrod appeared there and instructed Barbara to come to his office the following day.

Barbara spent all day May 11, 1981, in Harrod's office. She asked him what her rights would be in the event of a divorce. Harrod told her what Tommy would give her. She understood Harrod to be representing her. Harrod told her that he was her attorney and would take care of her. He telephoned Tommy several times that day and ultimately prepared an addendum to the trust, a property settlement agreement, and an entry of appearance, all of which were signed by Barbara. The trust addendum contained a clause stating that if any party challenged the trust he or she would forfeit his or her interest in the proceeds. Harrod told Barbara that the addendum was not valid unless filed and that it would not be filed unless it was necessary to protect her interest.

As Barbara left Harrod's office on May 11, 1981, Harrod informed her he would no longer represent her but would be representing Tommy. He filed Tommy's divorce petition. Even prior to the May 11, 1981, discussion between Barbara and Harrod, Harrod had hired Marler to investigate Barbara's "drug habits" in contemplation of a contested divorce proceeding. Marler sent Harrod a bill, dated May 7, 1981, in the amount of $1,575 for those services.

On June 12, 1981, Barbara returned to Harrod's office and asked him to delay the divorce. He replied he could not do so. The divorce was entered on June 15, 1981.

The trust addendum named Harrod as trustee. It was his duty to distribute the $2,000 monthly payments from Aetna. He did so for some five months until he resigned and appointed Barbara's daughter from her previous marriage as trustee. The daughter had married Tommy after Barbara and Tommy were divorced.

Other undisputed facts are that the trust monies were to be distributed among Barbara, Tommy, and the attorneys to cover their fee percentage of the award, and Harrod was to withhold $80 per month as a fee for handling the trust funds. During the five months he acted as trustee, Harrod failed to account for $20 per month or $100.

It is also undisputed that of the $400,000 initial payment to Tommy from Aetna, the attorneys were paid $355,542.63. Tommy later petitioned the federal court for a reduction in the amount approved to be paid to the attorneys, and $114,800.43 was remitted to him. The remission occurred after the divorce.

Harrod charged a $10,000 fee for representing Tommy in the uncontested divorce. Barbara and her son, James Ezell, testified that when they asked Harrod why the fee was so high he said it represented not only the divorce, which Tommy "could afford," but other services previously rendered to Tommy and Barbara.

The chancellor reached the following conclusions of law:

1. On May 11, 1981, Dave Harrod owed a fiduciary duty to Barbara Liles to represent and protect her interests in the divorce action against Tommy Liles.

2. Harrod breached his fiduciary duty to Barbara Liles by entering into a conspiracy with Tommy Liles to defraud Barbara Liles of her marital assets. Specific evidence of fraud includes the following acts:

(a) Harrod and Tommy Liles established an attorney-client relationship before May 11, 1981

(b) David Harrod attempted to secure evidence of drug abuse by Barbara Liles

(c) Tommy Liles and Harrod permitted Harrod to represent Barbara Liles when both knew that she trusted and relied upon Harrod's judgment and advice

(d) Neither Tommy Liles nor Harrod advised Barbara Liles of Harrod's representation of Tommy Liles in the divorce proceeding until after the execution of documents on May 11, 1981

3. Because of the conduct of Tommy Liles and Harrod, Barbara Liles was not properly represented in the divorce action and did not receive nor have an opportunity to receive proper consultation as to her rights in the

proceeding.

4. As a result of the conspiracy to defraud Barbara Liles of her marital assets, the property settlement agreement of May 11, 1981, shall be set aside and the marital property shall be returned to the marital corpus and distributed in accordance with the Court's final judgment and decree of this date.

5. [Here the court discussed the condition of the parties in the light of the factors listed in Ark. Stat. Ann. § 34-1214(A)(1) (Supp. 1985)]

6. For the reasons set forth in paragraph 5 above, the marital corpus shall be divided equally, except as stated below. The corpus shall include all proceeds from the Rowan settlement, including the remitted attorneys' fees and expenses; all real property owned by the parties as of May 11, 1981; and all personal property except personal items, mementos, effects and clothing, these items being the personal property of the respective party. In addition to his personal items, Tommy Liles shall be credited $10,000 as a set-off for future medical expenses and shall be credited $6,928.63 as a set-off for amounts paid on behalf of Barbara Liles and/or payments of marital debts since May 11, 1981.

7. The "in terrorem" clause in the addendum to the trust agreement shall be set aside because of the conspiratorial and fraudulent acts of Tommy Liles and Harrod.

8. A court of equity cannot award punitive damages and, therefore, the punitive damages claim of Barbara Liles shall be dismissed.

9. Harrod was not negligent in failing to calculate the amount of attorneys' fees and expenses that should have been paid from the initial $400,000 lump sum settlement payment.

10. Harrod and Tommy Liles did not commit fraud or enter into a conspiracy with the intent to defraud Barbara Liles of her marital assets by consenting to the structured settlement on May 2, 1981.

11. Because of his dual representation and fraudulent conduct, Harrod shall be required to return to the marital corpus the $10,000 fee he received for preparing the property settlement agreement, addendum to trust, and entry of appearance.

12. Because he did not account for $20 a month in disbursed trust proceeds, Harrod shall be required to return $100 to the marital corpus.

13. As a proximate result of Tommy Liles and Harrod's conspiratorial and fraudulent acts, Barbara Liles has sustained compensatory damages in an amount equal to her attorney's fees, costs and expenses in litigating this action. The court finds that the reasonable amount of Barbara Liles' fees, costs and expenses is $31,318.09.

14. These findings of fact and conclusions of law shall be incorporated by reference into the Court's final judgment and decree of this date.

### 1. Tommy Liles's Appeal

Tommy contends the evidence was insufficient to support the chancellor's finding of fraud by him or Harrod in the procurement of the property settlement agreement. He contends it was thus error to set aside the earlier decree which incorporated the agreement. He also contends reversal is in order because neither the Jones Act award, to the extent it represents reparation for a loss of Tommy's physical health, nor the remitted attorney's fee is marital property. Even if they are marital property, he argues, the virtually equal division was inequitable. He also contends it was error for the chancellor not to have upheld the forfeiture clause in the trust addendum.

### a. Evidence of Fraud

The appellant, Tommy Liles, misperceives the standard of review on this issue. We affirm the factual determinations of the chancellor unless they are clearly erroneous. Ark. R. Civ. P. 52(a).

Given the showing that Harrod was having Barbara's conduct investigated in preparation for representing Tommy in a divorce action while assuring Barbara he was her lawyer, we can

hardly say evidence of fraud on Harrod's part was lacking. As he was acting as agent of Tommy, Tommy is liable also. W. Seavy, *Agency*, § 91 (1964), notes that a principal is liable for statements by his attorney or other agent upon matters concerning which he is employed or held out to be the spokesman of the principal. *Providence-Wash. Ins. Co.* v. *Owens*, 207 S.W. 666 (Tex. Civ. App. 1918); *Chamberlin Co. of America* v. *Mayes*, 101 S.E.2d 728 (Ga. App. 1957); *Bituminous Cas. Corp.* v. *J. B. Forrest & Sons*, 209 S.E.2d 6 (Ga. App. 1974). While Harrod was not being "held out" as Tommy's agent when the misrepresentations were committed, the chancellor's finding that Harrod was representing Tommy was certainly not clearly erroneous.

### b. Forfeiture Clause

We will not address the issue of whether the forfeiture clause in the trust addendum was valid. The trust addendum was one of the items agreed to and signed by Barbara in Harrod's office just before he informed her he was representing Tommy in the divorce. The appellant correctly notes that we need not consider the question whether a chancellor may enforce a forfeiture clause if we affirm the chancellor's finding of fraud on the part of Tommy Liles.

### c. Jones Act Settlement As Marital Property

The appellant, Tommy Liles, contends that, to the extent the Jones Act award compensates him for injury resulting in reparations for his personal, physical loss of his previously healthy body, it does not constitute marital property. By phrasing his point in this way, he apparently concedes that, to the extent the award represents losses other than to Tommy's physical health, e.g., lost wages or medical expenses incurred, it does constitute marital property.

The appellant contends we should be guided by our decision in *Lowery* v. *Lowery*, 260 Ark. 128, 538 S.W.2d 36 (1976), in which we held that a Jones Act claim was not "personal property" and thus was not subject to division pursuant to the predecessor of the current Ark. Stat. Ann. § 34-1214 (Supp. 1985). In *Goode* v. *Goode*, 286 Ark. 463, 692 S.W.2d 757 (1985), we noted that *Lowery* v. *Lowery, supra*, no longer governs with respect to the question whether a personal injury judgment could

be marital property, as it was decided long before the landmark case of *Day* v. *Day*, 281 Ark. 261, 663 S.W.2d 719 (1984), where we emphasized that all property acquired by either spouse subsequent to marriage becomes marital property unless it is specifically excepted by the statute. Moreover, in *Lowery* v. *Lowery, supra*, we were considering whether a wholly unliquidated Jones Act claim was subject to the marital rights of the spouse of the claimant upon divorce. Here, the claim is liquidated, but part of the judgment is to be received in the future pursuant to the structured settlement. The amount to be received from Aetna is more "liquidated" than was the workers' compensation claim we held to have been marital property in *Goode* v. *Goode, supra*.

■■ Nor does it concern us that some of the money comprising the judgment may have been to compensate Tommy for the harm to his body, as opposed to lost wages and medical expenses. We pointed out in *Goode* v. *Goode, supra*, that the chancellor may take into consideration the health of the parties in dividing marital property in accordance with the statute. If we were to hold, as some jurisdictions, *see*, e.g., *Amato* v. *Amato*, 180 N.J. Super. 212, 434 A.2d 639 (1981), that the portion of a personal injury damages award specifically attributable to pain and suffering and bodily harm is so personal to the injured person that it may not be considered marital property, the chancellor would be faced with parsing a general, personal injury verdict to determine its parts, an often impossible task. What if the personal injury judgment occurred some years before the divorce; could we reasonably expect the chancellor in the divorce litigation to trace the portion specifically attributable to other than lost wages and medical expenses? Should we hold that an accompanying spousal loss of consortium recovery is personal to the spouse whose right to consortium was violated and thus not marital property? To do these things would effectively create another exception to add to the list in § 34-1214(A)(1), and we are not empowered to do so. In *Gan* v. *Gan*, 83 Ill. App. 3d 265, 404 N.E.2d 306 (1980), an Illinois court of appeals was faced with the same question while interpreting a statute much like § 34-1214. The court said "[t]he husband's personal injury settlement does not fit within any of the exceptions to marital property enumerated in the Act [404 N.E.2d at 309]." Responding to the husband's argument that his wife was, in effect, being allowed to take a part of his "being," the

court said:

> We think the husband misreads the purpose of the statute. It does not declare, in this case, that the personal injury settlement proceeds are to be awarded to the wife, in whole or in part. It provides merely that those funds are marital property. [404 N.E.2d at 309.]

### d. Remitted Attorney Fees

Several months after the divorce, Tommy sought and received a remittitur of attorney fees through the U. S. District Court in which his Jones Act case was tried. Although we do not have the federal court order before us, it is clear from the appellant's brief that the fees were paid out of the judgment. They, therefore, were a part of the judgment to which the attorneys were mistakenly held to have been entitled until Tommy pursued the remittitur.

In his initial brief, Tommy cited only *Lowery* v. *Lowery, supra,* as his basis for claiming the returned fees belonged solely to him. We need not repeat what we said above with respect to that case. In his reply brief, Tommy again argues the fees were no more than a contingent claim during the marriage and not to be considered marital property, citing our decision in the first appeal of *Potter* v. *Potter,* 280 Ark. 38, 655 S.W.2d 382 (1983). There we held that fees earned by an attorney during marriage but not collected by him until after divorce were not marital property. Again that opinion preceded *Day* v. *Day, supra,* and was based on cases overruled by *Day* v. *Day, supra.* Given the same situation, we might now reach a different decision. However, we need not make that determination in this case because the fees remitted here were no more than a part of the Jones Act judgment which the federal court found should have been awarded to Tommy while he was still married to Barbara. The chancellor was thus correct to include them in the marital property with the rest of the judgment proceeds.

### e. Almost Equal Division

Tommy Liles contends the chancellor abused his discretion by dividing the assets between him and Barbara equally. He cites the chancellor's finding that while Barbara is able to continue working as a nurse, Tommy may not be able to return to work as a

seaman. He contends that, to the extent the chancellor considered Barbara's contribution in nursing Tommy back to health, it was not a "factor [which] should entitle her to receive half his income for the rest of his life."

Section 34-1214(A)(1) provides, in part:

> All marital property shall be distributed one-half [½] to each party unless the court finds such a division to be inequitable, in which event the court shall make some other division that the court deems equitable taking into consideration (1) the length of the marriage; (2) age, health and station in life of the parties; (3) occupation of the parties; (4) amount and sources of income; (5) vocational skills; (6) employability; (7) estate, liabilities and needs of each party and opportunity of each for further acquisition of capital assets and income; (8) contribution of each party in acquisition, preservation or appreciation of marital property, including services as a homemaker; and (9) the federal income tax consequences of the Court's division of property. When property is divided pursuant to the foregoing considerations the court must state its basis and reasons for not dividing the marital property equally between the parties and such basis and reasons should be recited in the order entered in said matter.

The chancellor did not divide the Jones Act award precisely equally. He allowed $10,000 to be set aside for Tommy's future medical expenses. The chancellor's excellent and thorough letter opinion included discussion of each of the statutory factors to be considered upon unequal division. One of the statements in the opinion was as follows:

> Age, health, and station in life of the parties: Barbara Liles was 45 years old and Tommy Liles was 42 years old at the time of this hearing. The health of both appears to be average, although Tommy Liles may be unable to perform some manual labor because of his injury. However, he intended to buy and restore antique cars, invest in grocery stores, and pilot an airplane up and down the U. S. coast in search of similarly injured seamen. Barbara Liles is a nurse and apparently has the health to continue this type of work. The station in life of both parties has been enhanced by the

personal injury award and it appears that both would enjoy the same station in life with an equitable division of the settlement.

The chancellor did not abuse his discretion. His finding that the equal division of the property, with the one exception noted, would result in equality of lifestyles for the parties despite Barbara's continuing ability to engage in her profession and Tommy's probable inability to engage in his likewise fully supports the decree, and we will not disturb it. *See Ford v. Ford,* 272 Ark. 506, 616 S.W.2d 3 (1981).

## 2. Dave Harrod's Appeal

Harrod contends the judgment in Barbara's favor in the amount of her costs and attorney fee must be set aside because her claim was a deceit action of which the chancery court lacked subject matter jurisdiction. He also argues there was no substantial evidence to show his actions were the proximate cause of any injury suffered by Barbara and that, absent statutory authority, a tort claimant cannot recover her attorney's fee from a tortfeasor.

### a. Subject Matter Jurisdiction

Harrod suggests that the chancellor lacked jurisdiction to award damages to Barbara for the fraud he was found to have perpetrated against her in connection with the divorce litigation. He made no motion to transfer the claim to the circuit court and did not demand a trial by jury. He contends he may nevertheless raise the issue on appeal because the question is one of subject matter jurisdiction which may be raised at any time.

For the proposition that a tort claim may not be tried in chancery court, Harrod cites *Spitzer v. Barnhill,* 237 Ark. 525, 374 S.W.2d 811 (1964), and *Gorchik v. Gorchik,* 10 Ark. App. 331, 663 S.W.2d 941 (1984). In the *Spitzer* case the plaintiff sued in chancery court, asking that certain allegedly fraudulent conveyances be set aside. He also asked the chancellor to adjudicate his tort claim against the defendant who was apparently trying to get rid of all his property in anticipation of a judgment in the tort action favorable to the plaintiff. The chancellor issued a temporary order restraining the defendant

from conveying his property other than in the normal course of business and then transferred the tort claim to the circuit court. On appeal, the plaintiff-appellant contended the chancellor erred in transferring the tort claim to the circuit court.

Our opinion in the *Spitzer* case interpreted Ark. Stat. Ann. § 68-1308 (Repl. 1979), which states:

> In suits to set aside fraudulent conveyances, and to obtain equitable garnishments, it shall not be necessary for the plaintiff to obtain judgment at law in order to prove insolvency, but in such cases insolvency may be proved by any competent testimony so that only one (1) suit shall be necessary in order to obtain proper relief.

The appellant argued the statute required the chancellor to hear the tort claim, citing *Horstmann* v. *LaFargue*, 140 Ark. 558, 215 S.W. 729 (1919), which had so interpreted the statute. We overruled the *Horstmann* case in the *Spitzer* case and said:

> Upon reconsidering the matter we are convinced that our conclusion in the *Horstmann* case was wrong. Before the adoption of the statute in question it was necessary for a plaintiff to obtain a judgment at law before he could bring suit in equity to avoid a fraudulent conveyance. We think it clear that the statute was concerned only with the avoidance of fraudulent conveyances and was intended only to permit the plaintiff to obtain that relief (described in the act as "the proper relief") in a single suit. If the legislature had intended to bring about such a drastic change in our law as that of permitting personal injury actions to be tried in equity *as a matter of right*, we think that intention would have been stated in language too plain to be misunderstood. It certainly was not so stated. [237 Ark. at 528, 374 S.W.2d at 813; emphasis added]

Thus, in the *Spitzer* case, we were considering whether a statute made a tort action triable in the chancery court as a matter of right. That is not the issue before us now. Here the chancellor took jurisdiction of the fraud claim. We are not considering whether the plaintiff had a right to have the claim in chancery rather than the circuit court; rather the issue is whether the chancellor had the *power* to determine the matter.

The power issue, i.e., subject matter jurisdiction, was the issue in *Gorchik* v. *Gorchik, supra*. In that divorce case, a chancellor had awarded a sum to the husband which partially represented his claim against his wife for having shot him during the pendency of the divorce proceedings. Neither party raised the issue but the court of appeals, on its own motion, reversed that part of the decree. The court correctly cited *Hilburn* v. *1st State Bank of Springdale*, 259 Ark. 569, 535 S.W.2d 810 (1976), for the proposition that the question of subject matter jurisdiction is always open and may be raised by the court on appeal. However, the court then concluded on the basis of *Spitzer* v. *Barnhill, supra*, that the chancery court could not, through exercise of the equity clean-up doctrine, have subject matter jurisdiction of a tort claim as noted above. That was not the holding of *Spitzer* v. *Barnhill. Gorchik* v. *Gorchik, supra*, is thus overruled.

An ancillary citation in *Gorchik* v. *Gorchik, supra*, was *Chamberlain* v. *Newton County*, 266 Ark. 516, 587 S.W.2d 4 (1979). That case was somewhat more on point. The plaintiff-appellant at first sought to enjoin the county from using a road it had recently constructed on her land without permission from or compensation to her. She ultimately amended her complaint to ask only for damages. Our opinion went to some length to point out that she no longer claimed the right to an equitable remedy, and thus the chancery court lacked jurisdiction because she was merely asking for tort (trespass) relief. There was no equitable relief being sought to which the tort claim might have been considered incidental for the purpose of exercising the clean-up doctrine.

With *Chamberlain* v. *Newton County, supra*, we must compare *Bierbaum* v. *City of Hamburg*, 262 Ark. 532, 559 S.W.2d 20 (1977). In that case, the appellant gave the city land on which to build a pumping station, but the city built it on other land owned by the appellant. The appellant sought an injunction to prevent the city from continuing to operate the pumping station. The city counter-claimed to condemn the land on which the station had been built. The chancellor denied the injunction and, recognizing that the only issue was the amount of compensation to which the appellant was entitled, transferred the case to the circuit court for a determination of the appellant's damages. The appellant contended on appeal that the chancellor should

have retained the case to determine the damages. We said:

> Normally a landowner should not be denied the right for a jury to assess damages in a condemnation case. However, there are circumstances where a chancery court may assess damages in a condemnation case. This is such a case. First, the landowner filed a proper lawsuit in chancery court and, therefore, jurisdiction was properly obtained. Second, the public condemning authority, in this case the city, asked the court to condemn the land and assess damages. There was no objection by the landowner to the chancellor setting damages although damages were not what the landowner wanted. Third, the court on its own motion transferred the case to circuit court; the landowner did not ask for a jury trial on damages. We feel all these reasons were good cause for the chancellor to maintain jurisdiction and decide all issues in the case under the doctrine that once a chancery court acquires jurisdiction for one purpose it may decide all other issues. This doctrine is commonly referred to as the "clean-up" doctrine. *Selle v. City of Fayetteville*, 207 Ark. 966, 184 S.W.2d 58 (1944). [262 Ark. at 534; 559 S.W.2d at 21 and 22.]

Thus we held that the chancellor not only may determine the damages, or action-at-law, aspect of the case but must do so absent any request that the case be transferred, and must do so despite the prospect of granting any equitable remedy having long since faded away.

As we pointed out most recently in *Crittenden County v. Williford*, 283 Ark. 289, 675 S.W.2d 631 (1984), when the issue is whether the chancery court has jurisdiction because the plaintiff lacks an adequate remedy at law, we will not allow it to be raised for the first time on appeal. We noted it is only when the court of equity is "wholly incompetent" to consider the matter before it will we permit the issue of competency to be raised for the first time on appeal. *See also Whitten Developments, Inc. v. Agee*, 256 Ark. 968, 511 S.W.2d 466 (1974).

Viewed together, these cases demonstrate that we have come to the position that unless the chancery court has no tenable nexus whatever to the claim in question we will consider the matter of whether the claim should have been heard there to

be one of propriety rather than one of subject matter jurisdiction. We will not raise the issue ourselves, and we will not permit a party to raise it here unless it was raised in the trial court.

Of course, where the exclusive jurisdiction to adjudicate a matter has been placed by the constitution or by statute in some other court, such as probate matters in the probate court or bastardy proceedings in the county court, the question of subject matter jurisdiction may not be waived and the chancery court is totally without power.

Harrod contends the jurisdiction of the chancellor to set aside the property settlement agreement between Barbara and Tommy cannot be used to support hearing the tort claim against him because he was not a necessary party to that action. While that is so, it overlooks the other actions taken by the chancellor. The chancellor set aside the trust addendum and conducted an accounting of Harrod's actions as trustee. We do not hold, or even consider, whether the tort claim was so incidental to these clearly equitable remedies as to fall within the chancellor's power pursuant to the clean-up doctrine. See *Stolz v. Franklin*, 258 Ark. 999, 531 S.W.2d 1 (1975). We hold that the question is not one of subject matter jurisdiction, and the failure of Harrod to move for a transfer of the case or otherwise question the propriety of the chancellor hearing the case waived the issue, and it may not be raised for the first time on appeal.

### b. Proximate Cause

Harrod argues that his misconduct, as described by the chancellor, was not the proximate cause of the expense to which Barbara was put in having the property settlement set aside. His contention is that because this court had not yet decided *Day v. Day, supra*, Barbara got a really good deal in the property settlement he had arranged, as she was to receive $20,000 in cash which came from Tommy's Jones Act settlement to which she was not entitled.

That argument misses entirely the point that Harrod's fraud and professional misconduct were the bases for setting the property settlement agreement aside. Whether Barbara was getting a good deal, in Harrod's opinion, under the law as it existed in 1981, is irrelevant to the setting aside of the agreement

in 1985. The damages awarded to Barbara were to compensate her for the expense she incurred in having the agreement set aside. The reason for setting aside was the fraud perpetrated by Tommy Liles and Harrod upon her in the procurement of the agreement. The causal relationship between the conduct of Harrod and the injury to Barbara is obvious.

### c. Attorney Fee Recovery

In arguing that Barbara may not recover her attorney's fee against him, Harrod cites cases, *e.g.*, *Clawson* v. *Rye*, 281 Ark. 8, 661 S.W.2d 354 (1983), in which we have adopted the familiar "American rule" that a litigant may not recover an attorney fee in a tort action unless it is authorized specifically by statute or rule of court. In this case, however, Barbara does not seek to recover her attorney's fee and costs expended to pursue damages in a tort claim against Harrod. Rather, the attorney fee and costs sought here comprise the damages she seeks. Her claim against Harrod results from her having to sue Tommy as a result of Harrod's misconduct.

The Restatement (Second) of Torts, § 914(2) (1979), after stating the "American rule" in subsection (1), provides:

> (2) One who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover reasonable compensation for loss of time, attorney fees and other expenditures thereby suffered or incurred in the earlier action.

We have applied the same principle in breach of warranty title litigation. *Fox* v. *Pinson*, 182 Ark. 936, 34 S.W.2d 459 (1930). *Cf. May* v. *Edwards*, 258 Ark. 871, 529 S.W.2d 647 (1975). *See also Wilshire Oil Company of Texas* v. *Riffle*, 409 F.2d 1277 (5th Cir. 1969). Thus, if the action against Harrod were merely one in tort for deceit, we would allow Barbara to recover her attorney's fee and costs incidental to her suit against Tommy made necessary by Harrod's tortious conduct. In some jurisdictions it has been held that damages may not be recovered for costs and attorneys fees unless they are pursued in a subsequent, separate litigation. *See McNeill* v. *Allen*, 534 P.2d 813 (Colo. App. 1975); *Powell* v. *Narried*, 463 S.W.2d 43 (Tex. Civ. App. 1971). We see

no need to apply that requirement here, because, as we will note below, there are ample reasons for awarding the amount of the fee against both Tommy and Harrod.

There are other reasons to allow the fee even to the extent it represents the expenditure to which Barbara was put not just in her suit against Tommy but in suing Harrod along with Tommy. The chancellor conducted a fiduciary accounting with respect to Harrod's performance as trustee of the Tommy Liles trust. When an action is brought successfully against a trustee for breach of his trust, the award of an attorney's fee to the plaintiff is proper. *McPherson* v. *McPherson*, 258 Ark. 257, 523 S.W.2d 623 (1975).

While it is not relevant to Harrod's appeal, we note that the effect of Barbara's action to set aside the property settlement agreement was to reopen the divorce action against her. The award of her attorney's fee against Tommy was thus also appropriate, as such an award is within the chancellor's discretion in a domestic relations case. *Lytle* v. *Lytle*, 266 Ark. 124, 583 S.W.2d 1 (1979).

We find no error in awarding damages in the amount of Barbara's costs and her attorney's fee against Tommy and Harrod jointly and severally.

Another good reason for subjecting Harrod to liability is his departure from the ethical standards to which the court requires its officers to adhere. Harrod's attorney informed us during oral argument of this case that Harrod had been disciplined by our Committee on Professional Conduct as a result of his actions in the matter before us. While the letter of reprimand mentioned by Harrod's attorney hardly seems a sufficient punishment for Harrod's actions, we do not know the evidence our committee had before it, and that matter is not before us now for adjudication. We point out, however, that if there were no other reason whatever for sustaining the damages award against Harrod, we would do so on the basis of the chancellor's inherent authority to hold an officer of the court liable for an injury caused by his professional malfeasance.

Affirmed.

PURTLE, J., not participating.