2012 Ark. 383

**Clayton COKER, Appellant**

v.

**Samantha Hess COKER, Appellee.**

No. 11–1257.

Supreme Court of Arkansas.

Oct. 11, 2012.

Tapp Law Offices, Hot Springs, by: J. Sky Tapp, for appellant.

Hilburn, Calhoon, Harper, Pruniski & Calhoun, Ltd., by: Sam Hilburn, North Little Rock, and Mary Claire McLaurin, for appellee.

JIM HANNAH, Chief Justice.

Clayton Coker appeals a divorce decree entered in Garland County Circuit Court. Clayton asserts that the circuit court committed clear error in granting Samantha Hess–Coker a divorce based on the ground of indignities. He also asserts that the circuit court abused its discretion in granting an award of attorney's fees. We affirm the decree of divorce and reverse and remand the grant of attorney's fees.

■ The court of appeals reversed and dismissed the decision of the circuit court, *see Coker v. Coker*, 2011 Ark. App. 752, 2011 WL 6064889, and we granted Clayton's petition for review. When we grant a petition for review, we consider the appeal as though it had originally been filed in this court. *See Roberts v. Roberts*, 2009 Ark. 567, 349 S.W.3d 886.

■ This court reviews divorce cases de novo on the record. *Taylor v. Taylor*, 369 Ark. 31, 34, 250 S.W.3d 232, 235 (2007). We will not reverse a circuit court's finding of fact in a divorce case unless it is clearly erroneous. *Id.*, 250 S.W.3d at 235. Findings of fact made by the circuit court in a divorce case are reviewed by this court in the light most favorable to the appellee, and we will defer to the superior position of the circuit court to judge the credibility of witnesses. *Id.*, 250 S.W.3d at 235.

Clayton and Samantha were married on July 1, 1991. Samantha asserted below that Clayton engaged in long-term, sustained, and repeated periods of adultery that gave rise to indignities that rendered her life intolerable. Some time in 2006, Clayton began an affair with a woman in Wynne where Clayton and Samantha lived with their two children. Samantha learned of the affair one afternoon when she received a telephone call from her sister while attending a PTA function with her daughter. Her sister gave Samantha an address in Harrisburg where Samantha found her husband with his girlfriend. When confronted, Clayton admitted that he was having an affair. Clayton moved out of the marital home and into an apartment in Wynne.

After some time, Clayton reconciled with Samantha and moved back into the marital home. However, he later recommenced the adulterous relationship with the same woman. Some time later, Clayton again reconciled with Samantha, and after Clayton received an offer of a new position with his employer, he and Samantha decided to move to Hot Springs so Clayton could take the new position and the couple could start anew. However, once in Hot Springs, Clayton and his former girlfriend again recommenced their adulterous relationship. Upon discovering this, Samantha took the two children and moved from the 3500 square-foot marital home into a small apartment that required her to share a room with her daughter. Clayton moved his girlfriend into the parties' marital home after Samantha had moved out. Samantha testified about the difficulties that Clayton's affair had introduced into the family. She asserted that Clayton had lied to her and that he was demeaning to her. She alleged that he would tell her where he would be, but when she checked, he was not there. She testified that he attacked her verbally, that he got in her face, and that she was fearful that this behavior would continue. Samantha's mother testified that Samantha became extremely ner-

vous and that Clayton was inattentive and did not seem to care one way or the other about Samantha.

Beginning in 2006, Clayton made cash withdrawals to pay for restaurant meals, adult novelties, liquor, dock fees, gas for his boat, hotel rooms, movie rentals, diamonds, Victoria's Secret items, gifts, candy, and sporting goods. He took $64,935.06 out of his retirement account, which included funds acquired during the marriage. He used retirement-reinvestment proceeds amounting to about $4000 per year for his own purposes. He took out at least one $20,000 loan against his retirement account and used it for his own purposes. When he and Samantha sold their home in Wynne, they received $101,000 in equity. Clayton put $64,000 of that amount into the new house in Hot Springs and kept the rest. In addition, he failed to assure that Samantha was listed as an owner of the house in Hot Springs.

On March 29, 2010, Samantha filed a complaint for divorce alleging that Clayton had "offered such indignities as to render plaintiff's condition in life intolerable." The circuit court found that "[t]he Defendant was having an ongoing affair which [led] to Plaintiff's condition in life becoming intolerable."

■ Clayton asserts that the circuit court erred in granting the divorce based on the ground of indignities. Pursuant to Arkansas Code Annotated section 9–12–301(b)(3)(C) (Repl.2009), the circuit court may "dissolve and set aside a marriage contract, not only from bed and board, but from the bonds of matrimony ... [w]hen either party shall ... [o]ffer such indignities to the person of the other as shall render his or her condition intolerable."[1]

This quoted language on indignities remains unchanged since 1838. *See* Ark. Rev.Stat., Ch. 50 § 1 (1838).

In *Rachel v. Rachel,* 294 Ark. 110, 113, 741 S.W.2d 240, 242 (1987), this court faced facts strikingly similar to the present case:

> The appellant next argues that the Chancellor erred in granting the divorce because no grounds of divorce were proven. This argument is also without merit. The appellee testified that, in 1982, while she and appellant were married, he left her to live with another woman in Bastrop, Louisiana. They reconciled their differences almost two years later, and in September 1984, he moved back into the marital home. However, after only a few weeks he again started spending weekends with the other woman in Bastrop. The testimony established the ground of general indignities.

As in the present case, conditions arising from adultery gave rise to indignities. While adultery can give rise to indignities that may cause the spouse's condition in life to become intolerable, the act of adultery itself is a separate distinct cause for divorce under the statute. *See* Ark.Code Ann. § 9–12–301(b)(4) (Repl.2009). The two causes for divorce should not be confused.

■ It has been some time since this court addressed the requirements that must be met to grant a divorce under indignities:

> Although the scope of the "indignities" ground has undergone considerable expansion throughout the years, it is still necessary that the conduct relied upon manifest settled hate, alienation and estrangement and be constantly and sys-

---

1. Adultery itself is a separate, specific cause for divorce under Arkansas Code Annotated section 9–12–301(b)(4) (Repl.2009). However, Samantha did not plead adultery as the cause for her divorce but as the cause of the indignities that made her condition intolerable to justify divorce.

tematically pursued with the purpose and effect of causing an enduring alienation and estrangement and rendering the condition of the spouse intolerable. *McNew v. McNew,* 262 Ark. 567, 559 S.W.2d 155; *Welch v. Welch,* 254 Ark. 84, 491 S.W.2d 598. In the cited cases, we pointed out that even this construction of the statute is to be cautiously applied.

*Lytle v. Lytle,* 266 Ark. 124, 133–34, 583 S.W.2d 1, 6 (1979). Phrases such as "manifested settled hate, alienation, and estrangement" are terms of art and must be understood in the context of divorce law. Precedent from this court's initial consideration of the statutory language provides insight into the meaning of the phrases in the context of divorce law:

> The fifth cause of divorce set forth in the statutes [the language regarding indignities at issue in the present case] gives to our courts a broader jurisdiction than that exercised by the civil and ecclesiastical courts for legal cruelty; for indignities to the person may render the condition of the party intolerable without 'reasonable apprehension of bodily hurt' ... Personal indignities, such as rudeness, unmerited reproach, contempt, studied neglect, open insult, & c., and other plain manifestations of settled hate, alienation and estrangement, must be habitual continuous and permanent, to create that intolerable condition contemplated by the statute. But such indignities, when habitual and continuous, causing extreme and unmerited suffering, are sufficient to warrant a decree for divorce and alimony, without being attended with bodily harm, and need not be so extreme as to render the party incapable of discharging the marital duties.

*Rose v. Rose,* 9 Ark. 507, 507–08 (1849).

In the present case, Samantha offered evidence of Clayton's rudeness, unmerited reproach, and studied neglect. Evidence of Clayton's conduct was offered to show continuous and permanent conduct arising from a long-term adulterous relationship despite his apparent commitments to permanently end the affair and repair the marriage. This constituted evidence of the required "settled hate." We cannot say that the circuit court was clearly erroneous in finding that Clayton's conduct constituted such indignities to Samantha as to render her condition intolerable.

■ However, our analysis does not end there, because in contested divorce cases, evidence of the grounds of divorce must be corroborated, unless expressly waived in writing. *See* Ark.Code Ann. § 9–12–306 (Repl.2009); *Oates v. Oates,* 340 Ark. 431, 434, 10 S.W.3d 861, 863 (2000). Where a divorce case is sharply contested, the evidence of corroboration need only be slight. *See Welch v. Welch,* 254 Ark. 84, 85, 491 S.W.2d 598, 600 (1973). It is not necessary that the testimony of the complaining spouse be corroborated upon every element or essential fact. *Morgan v. Morgan,* 202 Ark. 76, 84, 148 S.W.2d 1078, 1082 (1941).

In the present case, Samantha presented evidence from her mother that Clayton was rude, inattentive, and did not care one way or the other about her. Additionally, Clayton's purchases of adult novelties, diamonds, items from Victoria's Secret, along with hotel bills and other charges, provide some inference that he was engaged in studied neglect, open insult, and alienation and estrangement. Finally, there was evidence of misuse of marital funds, which constitutes evidence of indignities. *See Mooney v. Mooney,* 265 Ark. 253, 578 S.W.2d 195 (1979). The requisite slight-corroborative evidence has been provided in this case.

We finally address the issue of attorney's fees. In domestic-relations proceedings, the circuit court has the inherent power to award attorney's fees, and the decision to award fees and the amount thereof are matters within the discretion of the circuit court. *See Baber v. Baber*, 2011 Ark. 40, 16–17, 378 S.W.3d 699, 708; *see also* Ark.Code Ann. § 9–12–309 (Repl. 2009). Absent an abuse of that discretion, an award of attorney's fees will not be disturbed on appeal. *Id.*, 378 S.W.3d 699, 708.

At the final hearing, Samantha asked the circuit court how she should proceed with a "petition" for "attorney's fees." The circuit court instructed her to submit an "affidavit" simultaneously with the filing of her proposed findings of fact and conclusions of law. The parties have not directed the court to any affidavit, and none is found in the record. Instead of filing the requested affidavit, Samantha included the following statement and request in her proposed findings of fact and conclusions of law:

> *Attorney's Fees.* The Plaintiff filed a contempt motion pertaining to the payment of support, medical bills and arrearages. Moreover, in light of the disparity in income, the Defendant should also be ordered to pay the Plaintiff's attorney's fees. The Plaintiff has incurred fees and expenses in the amount of $11,376.12.

While Samantha's proposed findings of fact and conclusions of law request the total sum of $11,376.12 for "fees and expenses," the decree grants Samantha a judgment "of the Plaintiff's attorney's fees in the amount of $11,376.12." Samantha did not request $11,376.12 in attorney's fees. Based on Samantha's failure to provide the requested affidavit, the failure to mention the requested expenses in the decree, and the grant of attorney's fees in an amount in excess of that Samantha's sought, we find an abuse of discretion. We reverse and remand for the circuit court to consider anew the request for fees and expenses.

Affirmed in part, reversed and remanded in part; court of appeals opinion vacated.

GOODSON, J., concurs in part; and dissents in part.

CORBIN and DANIELSON, JJ., dissent.

GOODSON, J., concurring in part; and dissenting in part.

I concur in the majority's decision that Samantha proved and corroborated grounds for divorce. However, I disagree with the conclusion that the award of attorney's fees must be reversed and remanded. Such a course departs from our precedent that commits fee awards to the sound discretion of the circuit court.

Clayton's sole argument on appeal is that the fee award of $11,376.12 is excessive. He argues that this is so because the nature of the case was relatively straightforward and because Samantha presented no documentation in support of her request for fees. Drawing from our own precedent, the court of appeals in *Paulson v. Paulson*, 8 Ark.App. 306, 652 S.W.2d 46 (1983), ably summarized the standards guiding such decisions,

> Whether the chancellor should award fees and the amount thereof are matters within the discretion of the chancery court. In determining whether to award fees he must consider the relative financial abilities of the parties. *Aucoin v. Aucoin*, 211 Ark. 205, 200 S.W.2d 316 (1947). Among the pertinent considerations in determining the amount of attorney's fees are the attorney's judgment, learning, ability, skill,

experience, professional standing, the relationship between the parties and the importance of the subject matter of the case, the nature, extent and difficulties of services, the research, anticipation of defenses and means of meeting them and receiving of confidential information and giving of confidential advice before any pleadings are filed or other visual steps are taken. In making these determinations the trial court's own experience and knowledge of the character of such services may be used as a guide. *Robinson v. Champion*, 251 Ark. 817, 475 S.W.2d 677 (1972). On appellate review considerable weight is given to the opinion of the judge before whom the proceedings were conducted. The chancellor is in a much better position to evaluate the services of counsel than an appellate court, and unless a clear abuse of discretion is evident, the chancellor's action in fixing attorney's fees will not be disturbed on appeal. *Warren v. Warren*, 270 Ark. 163, 603 S.W.2d 472 (1980).

In *Lytle v. Lytle*, 266 Ark. 124, 583 S.W.2d 1 (1979), we noted that the amount of time devoted by an attorney to the case is a significant, but not determinative factor. We cautioned against a "slavish obsession" of basing fees based on the numbers of hours spent and instead favored consideration of all the above-mentioned factors, trusting that trial courts are "able to evaluate the legal services equitably and to strike a balance between the interest of the lawyer and those of the client, or of the one who is to bear the burden." *Lytle*, 266 Ark. at 140, 583 S.W.2d at 9. We also held that it was not necessary that the trial court conduct a hearing on the amount of attorney's fees to be allowed because the

court had presided over the proceeding and was familiar with the case and the services rendered by the attorney. With these considerations in mind, we rejected the argument that the fee-award was infirm because there was "absolutely nothing in the record to afford an objective standard on which the trial court could assess and determine the amount of the fee." *Id.* at 138, 583 S.W.2d at 9.

This court has stated that abuse of discretion is a high threshold that does not simply require error in the trial court's decision, but requires that the trial court act improvidently, thoughtlessly, or without due consideration. *FMC Corp. v. Helton*, 360 Ark. 465, 202 S.W.3d 490 (2005); *Nazarenko v. CTI Trucking Co., Inc.*, 313 Ark. 570, 856 S.W.2d 869 (1993). Giving due deference to the trial court, I am unable to say that the court abused its discretion either in the amount of the fee awarded or by granting the fee based on the record before it.

DANIELSON, J., dissenting.

Because the majority should have taken the opportunity to overrule *Rachel v. Rachel*, 294 Ark. 110, 741 S.W.2d 240 (1987), rather than citing it with approval, I dissent.[1] I recognize that the attorneys and the circuit court in this case could have relied on *Rachel*; however, it was quite clearly a rogue opinion which changed the law and basically rewrote the applicable statute.

We have repeatedly held that divorce is a creature of statute and can only be granted when statutory grounds have been proved and corroborated. *See Oates v. Oates*, 340 Ark. 431, 10 S.W.3d 861 (2000); *Russell v. Russell*, 275 Ark. 193, 628

---

1. Although the issue of attorney's fees would not have been reached had the majority opinion overruled *Rachel* and reversed and re-

manded the case, I do agree that the circuit court erred in that award.

S.W.2d 315 (1982). Arkansas Code Annotated section 9–12–301(b)(3)(C) (Repl.2009) does provide that one ground for divorce is when one party offers "such indignities to the person of the other as shall render his or her condition intolerable." However, this court long ago set out what evidence is necessary to establish such indignities as a ground for divorce:

> It is for the court to determine whether or not the alleged offending spouse has been guilty of acts or conduct amounting to rudeness, contempt, studied neglect or open insult, and whether such conduct and acts have been pursued so habitually and to such an extent as to render the condition of the complaining party so intolerable as to justify the annulment of the marriage bonds. This determination must be based upon facts testified to by witnesses, and not upon beliefs or conclusions of the witnesses. It is essential, therefore, that proof should be made of specific acts and language showing the rudeness, contempt, and indignities complained of. General statements of witnesses that the defendant was rude or contemptuous toward the plaintiff are not alone sufficient. The witness must state facts-that is, specific acts and conduct from which he arrives at the belief or conclusion which he states in general terms-so that the court may be able to determine whether those acts and such conduct are of such nature as to justify the conclusion or belief reached by the witness. The facts, if testified to, might show only an exhibition of temper or of irritability probably provoked or of short duration. The mere want of congeniality and the consequent quarrels resulting therefrom are not sufficient to constitute that cruelty or those indignities which under our statute will justify a divorce.

*Bell v. Bell,* 105 Ark. 194, 195–96, 150 S.W. 1031, 1032 (1912).

Although *Bell* was decided long ago, it remains the law that in order to obtain a divorce on that ground, the conduct relied upon manifest settled hate, alienation and estrangement and be constantly and systematically pursued with the purpose and effect of causing an enduring alienation and estrangement and rendering the condition of the spouse intolerable. *See Lytle v. Lytle,* 266 Ark. 124, 583 S.W.2d 1 (1979); *McNew v. McNew,* 262 Ark. 567, 559 S.W.2d 155 (1977); *Welch v. Welch,* 254 Ark. 84, 491 S.W.2d 598 (1973). *See also Ransom v. Ransom,* 2009 Ark. App. 273, 309 S.W.3d 204; *Poore v. Poore,* 76 Ark. App. 99, 61 S.W.3d 912 (2001); *Russell v. Russell,* 19 Ark.App. 119, 717 S.W.2d 820 (1986). Additionally, corroboration must be testimony of a substantial fact or circumstance independent of the statement of a witness which leads an impartial and reasonable mind to believe that material testimony is true. *Welch, supra.*

In the instant case, there is no dispute that Samantha alleged indignities as her ground for divorce, not adultery, which is available as a ground for divorce pursuant to Ark.Code Ann. § 9–12–301(b)(4). However, when asked by the circuit court why she filed for divorce, more than once Samantha informed the court that she filed because Clayton was having an affair. If Samantha wished to file for a divorce based on adultery, that is clearly provided for by the applicable statute and her pleadings could have even been amended if necessary to reflect the proper grounds.

The testimony given by Samantha being viewed by the majority as grounds for indignities was actually not testimony given in the context of accusing Clayton of settled hate, alienation, or estrangement. Samantha was being questioned about her personal knowledge of the affair when she

testified that Clayton had lied to her about it and about his whereabouts. She was then asked about why she moved out and her testimony was that it was because he was lying to her, demeaning her, and would say he was going somewhere, but would not be there when she checked. Samantha did not testify that Clayton verbally attacked her and got in her face on a regular basis, nor did she claim that she was fearful he would continue that behavior on some ongoing basis. Her testimony revolved around an isolated incident. Samantha had placed a tracking device in Clayton's truck and also removed a pistol from the truck, but denied placing the device when asked about it in her deposition. She testified that she lied about it at her deposition because when Clayton had gotten mad at her before, he came at her verbally and got in her face. She testified that she lied at the deposition and removed the pistol from his truck because she was scared he would do that again. Samantha's testimony certainly provides grounds for a divorce based on adultery, especially considering that Clayton admits to the affair. However, the facts do not support that Clayton's behavior manifested settled hate, alienation, and estrangement that rendered Samantha's condition intolerable.

I have no doubt that when a spouse is having an affair, they could also be behaving extremely poorly toward their spouse and end up offering such indignities to their spouse that it renders the condition of that spouse intolerable. On the other hand, it is feasible that spouses are completely civil toward one another although one spouse or both is committing adultery. But, the majority has now cited with authority an opinion that conflated two separate statutory grounds for divorce into one and now allows adultery to qualify as grounds for indignities. Combined with *Rachel*, this case will set precedent, and the individual who files for divorce based on adultery, will now also provide sufficient grounds for indignities—a change in the law without any explanation or analysis provided in either of the opinions responsible for the change.

Put simply, Samantha should have picked the proper grounds for her divorce—which, made clear by her testimony, was Clayton's adultery—properly plead them, and put on the required proof. While the majority holds that conditions arising from Clayton's adultery gave rise to indignities in the instant case, that holding stretches the facts in an attempt to grant Samantha her divorce but also to distinguish this case from *Rachel* and do some damage control. The majority purports to set forth facts to support indignities separate and apart from the affair. However, those facts alone fail to amount to what has historically constituted indignities. As noted, *Rachel* and the instant case both stand for the proposition that a divorce based on the grounds of indignities may be granted with proof of adultery. Why then, I must ask, did the legislature make two separate statutory grounds?

Rather than clarifying what the law is and what it has been for over a century, the instant case does nothing but make it more obscure and causes conflict between the case law and the statute. I sympathize with the bench and the bar who are now left to sort it out.

CORBIN, J., joins.