Cite as 2025 Ark. App. 464

# ARKANSAS COURT OF APPEALS

DIVISION II
No. CV-24-255

| | |
|---|---|
| BRIANNA VAN PELT-WHITE<br>APPELLANT/CROSS-APPELLEE<br><br>V.<br><br>MATTHEW WHITE<br>APPELLEE/CROSS-APPELLANT | Opinion Delivered October 1, 2025<br><br>APPEAL FROM THE SEBASTIAN COUNTY CIRCUIT COURT, FORT SMITH DISTRICT<br>[NO. 66FDR-22-855]<br><br>HONORABLE DIANNA HEWITT LADD, JUDGE<br><br>AFFIRMED ON DIRECT APPEAL AND ON CROSS-APPEAL |

**KENNETH S. HIXSON, Judge**

Appellant Brianna Van Pelt-White (Brianna) appeals from a divorce decree entered in favor of appellee Matthew White (Matthew). On appeal, Brianna argues that (1) the trial court erred in granting Matthew a divorce without sufficient evidence and by not granting her a divorce; (2) the trial court erred by granting Matthew primary physical and legal custody of the parties' two minor children; and (3) the trial court erred in its division of marital property and marital debt. Matthew cross-appeals, arguing that the trial court erred in dismissing his posttrial motion for attorney's fees. We affirm on direct appeal and on cross-appeal.

I. *Standard of Review*

Our standard of review in domestic-relations cases is well settled. This court reviews domestic-relations cases de novo, but we will not reverse the trial court's findings unless they are clearly erroneous. *Doss v. Doss*, 2018 Ark. App. 487, 561 S.W.3d 348. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* Due deference is given to the trial court's superior position to determine the credibility of witnesses and the weight to be given their testimony. *Id.*

II. *Facts and Procedural History*

Brianna and Matthew were married in February 2018. The parties have two minor children: Minor Child 1 (MC1), a six-year-old boy, and Minor Child 2 (MC2), a five-year-old girl. During the marriage, the parties and their children lived in the marital home in Fort Smith. Brianna and Matthew are both employed by the Arkansas Air National Guard and have the same rank.

On November 22, 2022, Brianna filed a complaint for divorce. As grounds for the divorce, Brianna alleged that Matthew had treated Brianna with such general and personal indignities as to render her condition in life intolerable. Brianna alleged that she is the proper person to have sole custody of the parties' children subject to Matthew's reasonable visitation. Brianna also requested that the trial court divide the parties' real and personal property as well as the parties' debts.

On December 9, 2022, Matthew filed an answer and counterclaim for divorce. In his answer, Matthew denied Brianna's asserted grounds for divorce. In his counterclaim,

2

Matthew alleged that he was entitled to a divorce on the grounds of general and personal indignities. Matthew alleged that he should have care, custody, and control of the parties' children along with sole decision-making responsibility with respect to the children, subject to Brianna's reasonable visitation. Matthew also requested that the trial court equitably divide the parties' real and personal property and debts.

On November 3, 2023, Matthew filed a motion to prohibit nonemergency surgery on MC2. In that motion, Matthew alleged that Brianna had scheduled a tonsillectomy and adenoidectomy on MC2 for November 8, 2023, that Matthew did not approve of the surgery, and that he objected to any invasive medical procedure being performed on either of the children without the consent of both parents. Matthew asked for an order prohibiting Brianna from presenting MC2 for the tonsillectomy or adenoidectomy on November 8, 2023, or any other date without his express written consent, and further prohibiting her from presenting either child for any nonemergency medical procedure in the absence of his express written consent.

After an emergency hearing held on November 7, 2023, the trial court entered an order finding that Brianna did not inform Matthew of the consultation appointment prior to the scheduling of MC2's proposed tonsillectomy and adenoidectomy and had no good reason for not doing so. The trial court ordered that this procedure shall not be performed on MC2 until Matthew had the opportunity to consult with the child's surgeon, and that if after that consultation the procedure was still recommended for MC2, the parties shall follow the recommendation. The trial court also ordered, pending further orders, that the

3

parents shall follow the recommendations of the children's medical providers provided that the medical provider has previously consulted with both parents.

The final divorce hearing was held on December 7, 2023. Three witnesses, including Brianna and Matthew, testified at the hearing.

Brianna testified that she moved out of the marital home in Fort Smith about a month after she filed for divorce and moved to nearby Barling. She presently lives in a three-bedroom, two-bathroom duplex. Matthew remained in the marital home pending the outcome of the divorce.

Brianna testified about her alleged grounds of general indignities. She stated that during the marriage, she and Matthew did not get along and fought, which made her condition in the marriage intolerable. Brianna stated that, despite the fact that she and Matthew have the same military rank, Matthew wanted her to be a housewife. She stated that Matthew had attempted to either get her demoted or fired from the military. Brianna stated further that Matthew would degrade her and belittle her in front of the children and that, in the presence of the children, he once told her he wanted to "hate f*** her." He also tried to alienate her from her family.

Brianna testified that since the parties' separation, they have been equally sharing custody of the children on alternating weeks. Brianna also stated that since their separation, the parties have had difficulty agreeing on medical decisions regarding the children. Brianna testified that she wanted full custody of the children.

Brianna stated that she has an appropriate home for the children, and she introduced photographs that showed her house to be generally clean and orderly. By contrast, Brianna introduced photographs of the marital home where Matthew had lived since their separation, which showed portions of the house to be unclean and cluttered with laundry, dishes, or trash. Brianna stated that she was concerned that Matthew was neglecting the children when they were in his care. She stated that on one occasion, she was in the marital home and saw sixteen dirty pull-ups on the floor as well as cat feces. Brianna described the marital home as being generally unclean with "just a mess everywhere" and "stuff stacked all over the counters." She also complained that Matthew had provided the children with ill-fitting and worn-out clothing. Brianna introduced photographs of MC2 with a severe diaper rash and of MC1 with a bruise on his buttocks, which she said she noticed after Matthew had returned the children to her custody. Brianna also stated that Matthew is an obsessive video-game player, and she was concerned he was staying up most of the night playing video games and neglecting the children's needs.

During direct examination, Brianna's counsel stated, "[Y]ou and I both know that Matthew is likely going to introduce some images, videos, or at least some testimony of infidelity on your part," and Brianna stated, "Correct." Brianna was shown a photograph of her kissing a blonde woman, and Brianna stated that this occurred in their driveway before the parties had separated in June 2022 and that the children were inside the house asleep. There was another photograph of Brianna and the blonde woman underneath a blanket together on the parties' couch in the living room, which occurred while the children were in

the house asleep. There was also a video recording of Brianna kissing a different woman—who is also in the military—in the parties' driveway, which resulted in the military issuing a no-contact order between the women. Brianna also admitted that she had slept on the couch with this woman. Brianna explained that the parties had agreed to an "open marriage" but also acknowledged that she had engaged in poor decision making on some of these occasions. Brianna stated that the children did not witness any of these events.

Brianna was also confronted on cross-examination with Facebook messages wherein she and the aforementioned blonde woman had discussed "fisting" and "strapping," which Brianna stated was a joke but also acknowledged were "sexting" messages. Brianna further acknowledged that during the marriage, she took a ten-day trip to visit a third woman in Spain. In text messages sent before the trip, Brianna told the woman she was "giddy" at the thought of kissing her, she couldn't wait to feel her arms around her, and she intended to "straddle" her in the car. There was also another woman who lived in Knoxville, Tennessee, with whom Brianna had discussed Brianna moving there in a "daydream kind of way" were Brianna to be awarded custody. Brianna denied ever having genital contact with any of these women. Brianna also stated that she regularly ridiculed Matthew to her friends.

Brianna also testified about the parties' property. She stated that they owed about $250,000 on the marital home and that it had recently appraised for $355,000. Brianna stated that she wanted the marital home sold and the proceeds divided equally. Brianna stated that she drives a 2017 GMC Terrain and that Matthew drives a 2015 Nissan. Both parties have a thrift savings plan, with Brianna's valued at $26,265, and Matthew's valued at

$34,182. Brianna testified that the parties had marital credit-card debt of $7400, but after the parties separated, she took out a $20,000 SoFi loan and used part of the proceeds to extinguish that debt. Brianna also stated that because Matthew allowed his insurance to temporarily lapse on MC2, she had to pay some medical expenses for MC2, and she requested that Matthew be ordered to fully reimburse her for those bills.

Jasmine Brown, Brianna's friend, testified that she had witnessed Brianna and Matthew interact during the marriage. Jasmine stated that she had heard Matthew belittle Brianna by telling her she is supposed to do things a wife is supposed to do, like "cleaning up and things like that." Jasmine stated that Matthew spoke to Brianna in a belittling and demeaning manner, particularly in a few text messages she had seen. Jasmine also testified that Brianna had installed a lock on the bedroom door of the marital residence to prevent Matthew's entry while she slept in the room.

Matthew testified that he wanted sole custody of the children with full decision-making authority over them. Matthew stated that there is a lack of communication between him and Brianna, which includes important medical decisions regarding the children. He stated that since their separation, things between them have become very hostile, and they cannot get along. Matthew did not believe joint custody is in the best interest of the children, stating that during the marriage Brianna had introduced "three or four partnership transitions" into the children's lives and that he did not think this would change after the divorce. Matthew stated that, contrary to Brianna's testimony, he did not agree to an "open marriage" and that he had confronted her many times about her inappropriate behavior with

7

women, some of which had occurred at their house while the children were there. Matthew thought that Brianna was putting herself before the children by drinking at bars and engaging with other people romantically. He stated that during the marriage there were times when Brianna would not come home for two or three straight days. Matthew also stated that he saw a picture of Brianna kissing one of her female friends on Facebook.

Matthew did not deny that the photographs introduced by Brianna showed the marital house to be unclean in some areas, but he maintained that the house was in a similar condition during their marriage. He also stated that the house is not like that all the time and that it is presently in better condition and is suitable for the children. Matthew also denied that he neglects the children and stated that the bruise on MC1 was caused by an accident.

Matthew stated that during the marriage, he was the children's disciplinarian, while Brianna treated the children more like friends. Matthew stated that he makes sure the children understand why he disciplines them with a firm hand, and he acknowledged that he had used a belt and a wooden spoon to correct unacceptable behavior. He stated that if the trial court ordered that type of corporal punishment to cease, he would abide by the order. Matthew stated further that he has a loving and caring relationship with the children and that they play together, read books together, and go camping. Matthew stated that he is an appropriate caregiver to the children, having grown up as the second oldest of six children and taking responsibility for caring for his younger siblings.

Matthew also testified about the parties' property and debts. Matthew stated that rather than sell the marital home, he preferred to keep the house and continue living there with the children. With respect to the parties' debts, Matthew asserted that the parties' marital credit card had a zero balance before they separated. He stated that since their separation, a sizeable debt had accumulated but that he did not have access to the card. He maintained that any debt on the marital credit card had been acquired solely by Brianna after they separated.

At the conclusion of the parties' testimony, the trial court took the case under advisement.

On January 4, 2024—before the divorce decree was entered—Matthew filed an application for restraining order stating that MC2 was scheduled for a tonsillectomy and adenoidectomy on the following day and that he objected to the procedure. In an attached affidavit, Matthew stated that Brianna had made it clear that she was going forward with the surgery regardless of his lack of consent. In the motion, Matthew asked that Brianna be restrained from going forward with the surgery until a final custody decision has been made by the trial court.

Also on January 4, 2024—after the above motion was filed—the trial court entered the divorce decree that contained the following findings:

2. [Brianna] committed adultery and made [Matthew's] condition of life intolerable thereby. [Matthew] is granted an absolute decree of divorce from [Brianna] on his Counterclaim. [Brianna's] Complaint for Divorce is dismissed.

3. Two children were born of the parties hereto, namely [MC1 and MC2]. . . .

9

4. Each party seeks full custody. The Court finds [Brianna] not credible. On the other hand, the Court finds [Matthew] to be very credible. The Court finds that [Matthew] has presented clear and convincing evidence to rebut the presumption of joint custody. Specifically, the Court is convinced that the [Brianna] has exposed the children to her adulterous relationships. Furthermore, that if given primary custody, [Brianna] will alienate the children from [Matthew], to include, that this Court believes she plans to move to Tennessee and that she will continue to exclude [Matthew] from important life decisions for the children such as she has done with [MC2's] recent medical procedure, both before and after the [November 2023] hearing when this Court ordered both parties be included. It is also clear to the Court that [Brianna's] priorities are not the children but that she has a myopic view, focused on what she can gain from a situation. The parties also do not agree on what is best for the children. [Matthew] is the parent who will allow more frequent contact and foster the relationship with the children and the other parent. [Matthew] is hereby awarded the legal and physical custody of the children and all decision-making authority relating to the children. The Court is mindful that [Matthew] requested the Court award [Brianna] with a liberal visitation schedule should he be awarded custody and therefore, if for any reason the parties are unable to agree on a weekly schedule, the Court awards [Brianna] with the following *minimum* [standard visitation][.]

Considering the parties' incomes, the trial court found that Brianna's presumed child-support obligation was $843 a month, but given the anticipation that she would spend extra time with the children, the court deviated downward and ordered her to pay one-half that amount, or $421.50 a month. The trial court also restrained the parties from using corporal punishment with instrumentalities on the children and permitted only a hand on the children's buttock over clothing. With respect to the division of the parties' property and debt, the trial court found the following:

10. [Brianna] is awarded the 2017 GMC Terrain automobile and shall be solely responsible and liable for any and all debt owed in connection therewith, to include any debt service and personal property taxes and insurance.

10

11. [Matthew] is awarded his premarital 2015 Nissan automobile and shall be solely responsible and liable for any and all det owed in connection therewith, to include any debt service and personal property taxes and insurance.

12. The parties have acquired a marital homeplace located at 8704 Canopy Oaks Drive, Fort Smith, AR 72903. The home is valued between $355,000 and $360,000. The balance on the mortgage is approximately $254,000. [Matthew] has made all of the home mortgage payments for the past one year while the parties have been separated. [Matthew] shall place for sale on the private market (either by owner, or by realtor) for six months at a price recommended by a realtor. [Matthew] is awarded the use, possession and control of the homeplace until such time as it sells and he shall continue to be responsible for paying the mortgage indebtedness. If the home does not sell after six months, either party may petition the Court for a Court ordered public sale. If the home sells through the private market, the parties shall equally divide all sale proceeds remaining after first paying the mortgage, any outstanding taxes, insurance, closing costs and any realtor fees, if a realtor is enlisted. However, [Matthew] shall be entitled to a credit from [Brianna's] one half of proceeds for one half of the twelve payments he made up to the time of the divorce and for one half of payments made after the date of the divorce through the date the home is sold. Either party is free to buy the other party out of their one-half interest.

13. [Brianna] is in possession of the parties' tax return refunds in the approximate amount of $7400. [Brianna's] Thrift Savings Plan is valued at approximately $7500 less than [Matthew's] Thrift Savings Plan. [Brianna] is awarded all of the tax refunds and her Thrift Savings Plan, and [Matthew] is awarded his Thrift Savings Plan.

14. [Brianna] is ordered to be solely responsible and liable for her Sofi loan and for any debts in her individual name and she shall forever hold [Matthew] harmless thereon and indemnify him therefrom. [Matthew] shall be responsible for any debts in his individual name, and he shall forever hold [Brianna] harmless thereon and shall indemnify her therefrom.

15. The parties acquired various personal property during the marriage as identified on [Brianna's] Exhibit 2. If the parties cannot agreeably divide said marital property within thirty days hereof, then either party may petition the Court to sell it at a public sale. Should either party elect to do so, then the Clerk of Court will be appointed to act as the Commissioner and after the sale of all such property, the parties will equally divide all net sale proceeds after payment of the Clerk for costs relating to the sale.

Also on January 4, 2024—after the divorce decree was entered—the trial court entered an order granting Matthew's application for restraining order. In that order, the trial court prohibited Brianna from presenting MC2 for a tonsillectomy or an adenoidectomy on January 5 or at any other date in the absence of Matthew's express written consent. The trial court further prohibited Brianna from presenting either of the children for any nonemergency medical procedure without Matthew's express written consent.[1]

On January 12, 2024, Matthew filed a motion seeking $15,945 in attorney's fees. On January 29, 2024, Brianna filed a motion to dismiss Matthew's motion for attorney's fees because she was not personally served with the motion within fourteen days of the divorce decree as required by the Arkansas Rules of Civil Procedure. On February 22, 2024, the trial court entered an order granting Brianna's motion to dismiss Matthew's motion for attorney's fees because Matthew had failed to properly serve Brianna with the motion.

Brianna now appeals from the divorce decree, arguing that (1) the trial court erred in granting Matthew a divorce without sufficient evidence and by not granting her a divorce; (2) the trial court erred by granting Matthew primary physical and legal custody of the parties' two minor children; and (3) the trial court erred in its division of marital property and marital debt. Matthew cross-appeals from the trial court's order dismissing his motion for

---

[1]Brianna filed a motion to vacate the trial court's order granting Matthew's application for restraining order, which was later deemed denied.

attorney's fees, arguing that the trial court erred in dismissing his motion and in not awarding him attorney's fees.

III. *Brianna's Direct Appeal*

A.  The Trial Court Erred in Granting Matthew a Divorce Without Sufficient Evidence and by Not Granting Brianna a Divorce

Brianna's first argument is that the trial court erred in granting a divorce to Matthew because he failed to prove his grounds for divorce.  Brianna argues further that, instead of granting Matthew a divorce, the trial court should have granted her a divorce based on her allegation of general indignities and her testimony that during the marriage, Matthew rendered her condition intolerable by regularly belittling her and trying to isolate her from family and friends.

Brianna correctly asserts that, in Matthew's counterclaim for divorce, he alleged general indignities as his only ground for divorce.  The trial court granted Matthew a divorce because it found that Brianna "committed adultery and made [Matthew's] condition of life intolerable thereby."  Brianna argues that Matthew did not allege adultery in his counterclaim and that Matthew failed to prove adultery.  Brianna also argues that, although Matthew did allege the ground of general indignities, he failed to produce corroborating evidence of either general indignities or adultery.

The supreme court has held that divorce is a creature of statute and can be granted only when statutory grounds have been proved and corroborated.  *Oates v. Oates*, 340 Ark. 431, 10 S.W.3d 861 (2000).  Brianna cites *Atkinson v. Atkinson*, 72 Ark. App. 15, 32 S.W.3d

13

41 (2000), where our court defined adultery as voluntary sexual intercourse between a married person and a person other than the married person's spouse. Brianna contends that, although Matthew insinuated that she committed adultery, it was not pleaded, and there was no actual evidence to support it. Brianna states that, despite Matthew's failure to plead or prove adultery and his failure to produce corroborating testimony of any ground, the trial court granted Matthew a divorce. Brianna asserts that this was clearly erroneous and that the trial court should have instead granted her complaint for divorce.

We conclude that the trial court did not clearly err in granting Matthew a divorce for the following reasons. Arkansas Code Annotated section 9-12-301(b)(3)(C) (Repl. 2020) provides that the trial court may dissolve and set aside a marriage "[w]hen either party shall . . . [o]ffer such indignities to the person of the other as shall render his or her condition intolerable." In order to obtain a divorce on that ground, the plaintiff must show a habitual, continuous, permanent, and plain manifestation of settled hate, alienation, and estrangement on the part of one spouse, such to render the condition of the other intolerable, and examples include contempt, open neglect, and open insult. *Rocconi v. Rocconi*, 88 Ark. App. 175, 196 S.W.3d 499 (2004). In *Coker v. Coker*, 2012 Ark. 383, 423 S.W.3d 599, the supreme court stated that conditions arising from adultery give rise to indignities. While adultery can give rise to indignities that may cause the spouse's condition in life to become intolerable, the act of adultery itself is a separate, distinct cause for divorce under the statute. *See* Ark. Code Ann. § 9-12-301(b)(4).

The supreme court's decision in *Coker* is instructive. In *Coker*, the wife filed a complaint against the husband for divorce alleging that the husband had offered such indignities as to render her condition in life intolerable. The trial court granted a divorce to the wife, finding that the husband was having an ongoing affair that led to the wife's conditions in life becoming intolerable. The husband appealed and argued that the trial court erred in granting the divorce. The supreme court disagreed and held that the conditions arising from the husband's adultery gave rise to indignities. The supreme court wrote:

> In the present case, [wife] offered evidence of [husband]'s rudeness, unmerited reproach, and studied neglect. Evidence of [husband]'s conduct was offered to show continuous and permanent conduct arising from a long-term adulterous relationship despite his apparent commitments to permanently end the affair and repair the marriage. This constituted evidence of the required "settled hate." We cannot say that the circuit court was clearly erroneous in finding that [husband]'s conduct constituted such indignities to [wife] as to render her condition intolerable.

*Coker*, 2012 Ark. 383, at 5–6, 423 S.W.3d at 603.

As in *Coker*, we conclude that Brianna's inappropriate conduct with persons other than her spouse during the parties' marriage was properly considered by the trial court in reaching its decision that Brianna had made Matthew's condition of life intolerable such to prove the ground of general indignities. Matthew testified that Brianna was intimately involved with multiple women during the marriage, which included kissing other women in the parties' driveway while the children were inside the house and being under the covers with a woman on the parties' couch while the children were asleep in their bedrooms. In addition, Matthew testified that he saw a picture of Brianna kissing another woman on

15

Facebook, which exposed him to the embarrassment of the picture being published to other viewers. Even if Matthew was unable to conclusively prove adultery, the evidence presented in this regard rises to the level of unmerited reproach, studied neglect, and open insult such that the trial court's finding that Brianna's conduct had made Matthew's condition intolerable was not clearly erroneous.

However, our analysis does not end there because in contested divorce cases, evidence of the grounds of divorce must be corroborated, unless expressly waived in writing. *See* Ark. Code Ann. § 9-12-306 (Repl. 2020); *Oates*, 340 Ark. at 434, 10 S.W.3d at 863. When a divorce case is sharply contested, the evidence of corroboration need only be slight. *Coker*, *supra*. It is not necessary that the testimony of the complaining spouse be corroborated upon every element or essential fact. *Id.*

In *Coker*, *supra*, the supreme court held that evidence of the husband's hotel bills and other charges provided some inference that he was engaged in studied neglect, open insult, and alienation and estrangement; also, the evidence of misuse of marital funds constituted evidence of indignities. In light of this evidence, the supreme court concluded that "[t]he requisite slight-corroborative evidence has been provided in this case." *Coker*, 2012 Ark. 383, at 7, 423 S.W.3d at 603. In *Goodlet v. Goodlet*, 206 Ark. 1048, 178 S.W.2d 666 (1944), the record contained a valentine addressed "To my Joe" and signed "All my love, your wife, Nell,"—found by the appellee wife in appellant husband's suitcase—which indicated his misconduct with other women about whom their troubles frequently arose and was held by the supreme court to be some corroboration of her charge of indignities.

16

We similarly hold that there was sufficient corroborating evidence provided in the instant case. There was evidence of electronic messages sent between Brianna and other women that included romantic and sexual inferences. There were also photographs and a video recording showing Brianna kissing two different women in the parties' driveway and also sitting under a blanket with one of the women on the parties' couch. And finally, there was testimony from Jasmine Brown that Brianna had installed a lock on the bedroom door of the marital residence during the marriage and was living in the house separately from Matthew, which is further evidence of Brianna's alienation and estrangement of Matthew. Our supreme court has stated that the purpose of the rule requiring corroboration is to prevent procuring divorces through collusion, and where it is plain there is no collusion, the corroboration may be comparatively slight. *See Goodlet*, *supra*. Here, there was no suggestion of collusion, and we conclude that the evidence set forth above sufficiently corroborates Matthew's testimony to justify the trial court in granting the divorce decree.

With respect to Brianna's contention that she should have been granted a divorce on her asserted grounds of general indignities, we note that in the divorce decree, the trial court specifically found Brianna not credible, and we are bound by the trial court's credibility determinations. We cannot say the trial court was clearly erroneous in granting Matthew a divorce and in dismissing Brianna's complaint.[2]

---

[2]Also under this point, Brianna suggests that in granting the divorce decree, the trial court improperly considered and was inflamed by Matthew's posttrial affidavit in support of his motion to restrain Brianna from going forward with MC2's proposed surgery, which was not part of the evidence introduced at trial. Brianna seizes on the trial court's finding in the

17

B. The Trial Court Erred by Granting Matthew Primary Physical and Legal Custody of the Parties' Two Minor Children

Brianna next argues that the trial court erred in awarding Matthew primary physical and legal custody of the parties' children. Brianna asserts that Matthew failed to rebut the statutory presumption in favor of joint custody and asserts further that if the joint-custody presumption was rebutted, it was rebutted by her and that she should be awarded primary custody of the children. Brianna cites *Hortelano v. Hortelano*, 2017 Ark. App. 98, 513 S.W.3d 890, where we stated that despite a parent's lifestyle and romantic relationships, the primary consideration in child-custody cases is the welfare and best interest of the children. Brianna asserts that while she might have explored relationships with other individuals, there was no evidence of adulterous relationships, nor was there evidence that the children were exposed to or harmed by any such relationship. Brianna argues further that Matthew had been neglecting the children as evidenced by the uncleanliness of the marital home where he was living and the fact that the children sustained diaper rashes and bruising while in his care. Brianna also notes that Matthew admitted striking the children on their bottoms with a belt

---

decree that the court believed that Brianna would "continue to exclude [Matthew] from important life decisions for the children such as she has done with [MC2's] recent medical procedure, both before and after the [November 2023] hearing when this Court ordered both parties be included." However, it is not evident that the trial court was considering anything in Matthew's affidavit; it instead appears that the trial court was referring to Matthew's testimony at trial that, shortly after the November 2023 hearing where Brianna had been ordered to consult with him about MC2's medical procedures, Brianna had engaged in important communications with medical personnel without consulting Matthew. We see no impropriety in the trial court's finding in this regard.

or a wooden spoon. Brianna states that, by contrast, she introduced photographs showing her house to be clean, organized, and a proper environment for raising young children. Brianna contends that Matthew is unfit to care for the children and that she is the proper parent to have custody.

We perform a de novo review of child-custody matters, but we will not reverse the trial court's findings unless they are clearly erroneous. *Hamerlinck v. Hamerlinck*, 2022 Ark. App. 89, 641 S.W.3d 659. We recognize and give special deference to the superior position of the trial court to evaluate the witnesses, their testimony, and the child's best interest. *Id.* The supreme court has stated that there is no other case in which the superior position, ability, and opportunity of the trial court to observe the parties carries a greater weight than one involving the custody of minor children. *Taylor v. Taylor*, 345 Ark. 300, 47 S.W.3d 222 (2001).

The primary consideration in child-custody cases is the welfare and best interest of the child, with all other considerations being secondary. *Wallace v. Pyle*, 2024 Ark. App. 496. In an original child-custody determination, there is a rebuttable presumption that joint custody is in the best interest of the child. Ark. Code Ann. § 9-13-101(a)(1)(A)(iv)*(a)* (Supp. 2023). The presumption may be rebutted if the court finds by clear and convincing evidence that joint custody is not in the best interest of the child. Ark. Code Ann. § 9-13-101(a)(1)(A)(iv)*(b)(1)*. While there is a statutory preference for joint custody, this preference does not override the ultimate guiding principle, which is to set custody that comports with the best interest of the child. *Tubbs v. Tubbs*, 2025 Ark. App. 315, 716 S.W.3d 204.

19

We hold that the trial court did not clearly err in finding that Matthew presented clear and convincing evidence that joint custody was not in the children's best interest. Matthew testified that, since the parties' separation, things between him and Brianna had become very hostile and they could not get along. For this reason, Matthew thought that the temporary joint-custody arrangement that had been implemented pending the divorce was not working for the children. Both parties testified that there was a lack of communication between them, particularly with regard to medical decisions involving the children. We have stated that the mutual ability of the parties to cooperate in reaching shared decisions in matters affecting the children's welfare is a crucial factor bearing on the propriety of an award of joint custody. *See Styles v. Styles*, 2024 Ark. App. 435, 699 S.W.3d 693. Given the hostility between Brianna and Matthew and their lack of cooperation in coparenting the children, it is evident that joint custody would not have been in the children's best interest.

Furthermore, we conclude that the trial court's award of primary custody to Matthew was not clearly erroneous. Matthew testified extensively regarding his parenting skills and asserted that during the parties' marriage, he was the disciplinarian while Brianna acted more like the children's friend. Matthew testified that he has a loving and caring relationship with the children and that they engage in numerous meaningful activities together. He also testified that during the marriage, there were times that Brianna would not come home for two or three days and that he thought she was more interested in her romantic relationships than caring for the children. Matthew acknowledged that his house was not always clean,

but he denied that he neglected the children and stated that the house was now in better condition than was depicted in the photographs Brianna introduced at trial. And although Matthew did state that he had disciplined the children with a belt and a wooden spoon, he also stated that he would abide by a court order to not do so in the future, which the trial court included in the divorce decree by restraining both parties from using corporal punishment with instrumentalities on the children. It was in the trial court's purview to judge the credibility of the witnesses in assessing the best interest of the children, and the trial court found Matthew very credible and Brianna not credible. Having reviewed the record, we hold that the trial court did not clearly err in determining that it was in the children's best interest to be placed in Matthew's custody.

C. The Trial Court Erred in its Division of Marital Property and Marital Debt

Brianna's remaining argument is that the trial court erred in dividing the parties' property and debt in such a way to amount to an unequal division without making written findings in support. Brianna specifically argues that (1) the trial court erred in denying her request for reimbursement of medical bills caused by Matthew temporarily allowing MC2's insurance to lapse; (2) the trial court erred in ordering her to pay one-half of the mortgage payments on the marital house until the house sold; and (3) the trial court erred in assessing $7400 in marital credit-card debt against her. We conclude that there was no clear error in the trial court's distribution of the parties' property and debt, as explained below.

In accordance with Arkansas Code Annotated section 9-12-315(a)(1) (Repl. 2020), upon entry of a divorce decree, the trial court shall equally distribute all marital property

21

one-half to each party unless it is determined that such a distribution would be inequitable; if the property is not divided equally, then the trial court must state the reasons and bases for not doing so, and the bases and reasons should be recited in the order entered in the matter. *Chambers v. Chambers*, 2017 Ark. App. 429, 527 S.W.3d 1. Our appellate courts have consistently interpreted section 9-12-315(a) to grant the trial court broad powers in distributing both nonmarital and marital property to achieve an equitable division. *Moore v. Moore*, 2019 Ark. 216, 576 S.W.3d 15. We have held that any exception to the rule of equal distribution will always depend on the specific facts as reflected by the trial court's findings and conclusions. *Kelly v. Kelly*, 2014 Ark. 543, 453 S.W.3d 655. The trial court is vested with a measure of flexibility in apportioning the total assets held in the marital estate upon divorce, and the critical inquiry is how the total assets are divided. *Jones v. Jones*, 2014 Ark. 96, 432 S.W.3d 36. The overriding purpose of the property-division statute is to enable the court to make a division that is fair and equitable under the circumstances. *Id.* Marital property cannot always be divided exactly equally and in kind. *Id.* Stated differently, the property-division statute does not compel mathematical precision in the distribution of property; it simply requires that marital property be distributed equitably. *Id.* Further, the allocation of marital debt must be considered in the context of the distribution of all of the parties' property. *Boxley v. Boxley*, 77 Ark. App. 136, 73 S.W.3d 19 (2002).

In its division of marital property and debt, the trial court's decree did not give Brianna credit for medical bills she paid on behalf of MC2, which, by our calculations, totaled $620.84. With respect to the marital home in which the parties had an equal

22

financial interest, the parties were ordered to each pay half of the mortgage until the house sold, and if the house did not sell within six months, either party could petition for a judicial sale. Once the house sold, the parties were to divide the proceeds equally after paying the outstanding mortgage and other costs. With respect to the $7400 in marital credit-card debt that Brianna claimed to have paid off with a SoFi personal loan, Matthew testified that there was a zero balance on the credit card when the parties separated and that any debt that accumulated after that was Brianna's responsibility since she had exclusive access to the card. In addition to these matters, the trial court also made provisions in the divorce decree for division of the parties' personal property, tax refunds, thrift savings plans, and debts in their individual names.

Mathematical precision is not required in distributing the parties' property and debt. Considering the broad powers given to the trial court in this regard to achieve an equitable division and having reviewed the division of all the parties' total assets and debt, we are not left with a definite and firm conviction that a mistake has been made.

IV. *Matthew's Cross-Appeal*

On cross-appeal, Matthew argues that the trial court erred in dismissing his motion for attorney's fees. The events relevant to this point are as follows. The trial court entered the divorce decree on January 4, 2024. On January 12, Matthew filed a motion for attorney's fees, *which he served via eFlex on Brianna's counsel only*. On January 29, Brianna filed a motion to dismiss Matthew's motion for attorney's fees because the motion was not served on her personally and therefore did not comply with the Arkansas Rules of Civil Procedure. On

23

February 22, the trial court entered an order granting Brianna's motion, thereby dismissing Matthew's motion for attorney's fees.

We conclude that the trial court committed no error in this regard. Arkansas Rule of Civil Procedure 54 governs claims for attorney's fees, and Rule 54(e)(2) provides, "Unless otherwise provided by statute or order of the court, the motion for attorney's fees must be filed no later than 14 days after entry of judgment." Rule 5 provides how service must be made, and subdivision (b)(1) of that rule provides, "Whenever under this rule or any statute service is required or permitted to be made upon a party represented by an attorney, the service shall be upon the attorney, *except that service shall be upon the party* if the court so orders *or the action is one in which a final judgment has been entered and the court has continuing jurisdiction.*" (Emphasis added.)

The trial court did not err in dismissing Matthew's motion for attorney's fees because, although Matthew timely filed his motion for attorney's fees within fourteen days of the divorce decree, he failed to serve the motion on Brianna personally. It is undisputed that the January 4, 2024 divorce decree was a final order and that the trial court had continuing jurisdiction. Therefore, pursuant to the plain language of Rule 5(b)(1), Matthew was required to personally serve Brianna with his motion, and such failure was fatal to his motion. *See Mullenix v. Mayberry*, 2023 Ark. App. 139, 662 S.W.3d 691 (reversing an award of attorney's fees for noncompliance with Rule 5(b)(1) and stating that, in reviewing Rule 5, there is no room for ambiguity).

While acknowledging that the divorce decree was a final order, that the trial court had continuing jurisdiction, and that he failed to personally serve Brianna with his motion for attorney's fees, Matthew nonetheless argues that it was erroneous for the trial court to dismiss his motion for various reasons. We, however, are unpersuaded by any of Matthew's arguments.

Matthew first argues that, because Brianna filed a motion to vacate the trial court's order granting Matthew's application for restraining order *after the final divorce decree was entered*, and Brianna failed to personally serve Matthew with that motion as required by Rule 5(b)(1), Brianna had similarly failed to comply with the rule, which constituted invited error. However, we fail to see how Brianna's noncompliance with the rule absolves Matthew's noncompliance. Next, Matthew contends that per the Arkansas Rules of Civil Procedure, he was not given ample time to respond to Brianna's motion to dismiss his motion for attorney's fees because under Rule 6, he should have had until February 15 to respond. However, we reject this argument because, although the trial court issued a letter opinion indicating its dismissal of Matthew's motion on February 13, it did not formally enter the order of dismissal until February 22. Next, Matthew argues that Brianna abandoned her motion to dismiss when she abandoned all pending but unresolved claims in her notice of appeal filed prior to entry of the trial court's order dismissing the attorney's-fee motion. However, Brianna's motion to dismiss was not a "pending but unresolved claim" as contemplated by Ark. R. App. P. –Civ. 3(e)(vi). Finally, Matthew suggests that if personal service was required, he should have been given 120 days to effect service. However, we

reject this argument as well because Rule 54(e) plainly provides that a motion for attorney's fees must be filed *and served* within fourteen days of the judgment. *See Mullenix*, *supra*.

We hold that, based on a straightforward application of the relevant court rules, the trial court did not err in dismissing Matthew's motion for attorney's fees.

## V. *Conclusion*

For the reasons stated herein, we reject all of Brianna's arguments on direct appeal, and we affirm the divorce decree. We also reject Matthew's arguments on cross-appeal, and we affirm the trial court's order dismissing Matthew's motion for attorney's fees.

Affirmed on direct appeal and on cross-appeal.

ABRAMSON and THYER, JJ., agree.

*Skarda Law Firm*, by: *Cecily Skarda*, for appellant/cross-appellee.

*Edwin G. Dooley, Jr.*, for appellee/cross-appellant.